## VAPOR BLAST MFG. CO. et al. v. PANG-BORN CORPORATION.

### No. 6175.

United States Court of Appeals
Fourth Circuit.

Argued Nov. 10, 1950.

Decided Dec. 30, 1950.

---

J. Kemp Bartlett, Jr., Baltimore, Md., and Howard A. Hartman, Chicago, Ill. (S. L. Wheeler and H. William Ihrig, Milwaukee, Wis., on brief), for appellants.

Arthur G. Connolly, Wilmington, Del. (Venable, Baetjer & Howard, Joseph France and Stuart S. Janney, Jr., all of Baltimore, Md., on brief), for appellee.

Before PARKER, SOPER and DOBIE, Circuit Judges.

DOBIE, Circuit Judge.

Plaintiffs, Vapor Blast Manufacturing Company (hereinafter called Vapor) and A. H. Eppler, instituted a civil action in the United States District Court of the District of Maryland, against the Pangborn Corporation (hereinafter called Pangborn), alleging infringement by Pangborn of the Eppler patent, No. 2,462,480. Only claims 15 and 21 of the patent are here in suit. The District Judge concluded:

"Summarizing our conclusions they are: (1) Defendant's device infringes both of the claims of the Eppler patent in suit, numbers 15 and 21; (2) these claims are sufficiently specific in the light of the specifications; but (3) they are invalid because anticipated by the prior British patent to Mathewson." [93 F.Supp. 792, 798.]

The complaint was, accordingly, dismissed and plaintiffs have duly appealed to us.

The two claims in suit read as follows:

"No. 15 (the method claim). A method of cleaning and polishing which comprises the suspension of a predetermined amount of abrasive particles in a predetermined amount of carrier liquid, circulating the liquid suspension of abrasive particles upon a predetermined path while maintaining the portions of liquid and abrasive approximately constant and maintaining the distribution of the abrasive approximately constant throughout the carrier

liquid, and jetting portions of the circulating carrier liquid and abrasive against the surface to be cleaned or polished."

"No. 21 (the apparatus claim): Polishing apparatus comprising a charge of liquid carrier and abrasive particles in suspension therein in approximately fixed portions, a collecting sump, a work support above the sump from which portions of the treating charge will drain into the sump, a nozzle, an air supply connection to the nozzle, an emulsion supply for said nozzle including a circulatory system leading from. and returning to said sump and intermediate in communication with the nozzle and means for pumping the said charge through the system to supply the nozzle with portions of the charge under pressure."

The details of the Eppler patent are made clearer by the rather elaborate specifications of the patent, from which we quote:

"A primary object of the invention is to use fluid-borne abrasives to finish or polish surfaces and to be able to control the finishing and polishing operation with such accuracy as to be able to produce a highly finished surface on parts having the most minute tolerances.

"Another object of the invention is to provide a new type of satin finish on metals, which has important advantages for bearings and other purposes. In bearings the improved finish produced according to the method hereinafter to be disclosed holds an oil film in the bearing more satisfactorily than any other type finish. Moreover, the finish has advantages quite apart from bearings in that it is very attractive and is rust resistant, and shows an increase amounting to as much as five to ten percent in tensile strength as compared with the same parts finished by other methods.

"An important object of the invention lies in the fact that the wide control possible in its use permits of every type of operation from the coarsest rough or deburring cut to the finest honing or polishing. As will hereinafter be more fully explained, the results achieved result from a novel method and apparatus using the abrasive in suspension in a liquid. I am able to

deliver up to four to six times as much weight of abrasive material per minute as in any previous fluid-borne abrasive apparatus, at the same time controlling results so effectively as to be able to finish the most delicate parts.

\* \* \* \* \* \*

"The abrasive comprises a liquid carrier having the abrasive material in suspension. In the past, liquids have been used as carriers for abrasive material, but in general the abrasives have been introduced into the carrier at the nozzle, and in no instance has the abrasive been in suspension in the carrier.

"In the sand blasting art the finest abrasive capable of effective use in an air blast has been of the order of 80 mesh, and all attempts to use a liquid vehicle or carrier for abrasives have involved the use of the same sorts of abrasives generally used in pneumatic sand blasting apparatus. I have discovered that by using finer abrasives or by using emulsifying agents, or by both of these procedures, I am able to maintain the abrasive in suspension so that with the entire mass of emulsion in constant circulation I am able to assure a substantially uniform distribution of the abrasive throughout the liquid vehicle.

"For the high degree of polishing, which is one of the outstanding achievements of the invention, the fineness of the abrasive exceeds anything previously though usable in this art. As above pointed out, 80 mesh abrasive is the finest ordinarily used in sand blasting. The finest abrasives available on the market for use in lapping compounds and such other fine polishing work are about 650 to 700 mesh. This is the approximate fineness of talcum powder. The abrasives which I use in the practice of the present invention range all the way from 100 to 2500 mesh, the latter comprising an impalpable powder. The preferred range of sizes is from approximately 200 mesh to approximately 1300 mesh.

"The liquid vehicle is preferably water with chemicals added. In the apparatus disclosed I may, for ordinary work, use 50 pounds of abrasive in a dry state to 50 pounds of the aqueous vehicle. To the

water I preferably add a rust inhibiting chemical, such as the product commercially known as Metrolux, which contains tri-sodium phosphate, sodium chromate, and a form of lime which contains boron.

\* \* \* \* \* \*

"It is very desirable to use air rather than water as a means of imparting energy to the jet delivered from the nozzle. If water were added the character of the emulsion would constantly be changing. It is important to the control of the character of the finish and the amount of metal to be removed that the proportion of water to abrasive in the emulsion be kept relatively constant. Moreover, the fact that I employ chemicals in the emulsion makes it desirable to avoid undue dilution. Since the only water added to the emulsion is that which flushes the packing of the pump, I am able to operate over long periods with a single charge of emulsion without materially changing the specified proportions of the ingredients. However, air would not be as satisfactory to impel the abrasive jet if the air had to do work in delivering the emulsion to the nozzle, as much of the force of the jet would then be lost. It will be noted that the circulation maintained by the pump is such that at all times a supply of emulsion is maintained in the overhead tank 37 at a constant pressure to flow by gravity to and from the nozzle whether or not the air valve is open. Thus, the only function of the air is to give force to the jet issuing from the nozzle."

We first discuss the validity of the claims in suit. Claim 15, the process claim, and Claim 21, the apparatus claim, as the District Judge observed, "are obviously so interwoven that while the language of the two claims differs, it is appropriate to consider them together." This becomes even more obvious upon a reading of the specifications.

The essential elements of the Eppler patent may be rather simply stated. These seem to be: (1) a metal sump tank in which a predetermined amount of abrasive particles is placed in liquid suspension; (2) a circulatory system by means of which the emulsion is pumped through a pipe from the bottom of the sump tank to a supply tank positioned above the top of the sump tank: one leading from the lower inside part of the supply tank, which acts as a supply line and is described as the secondary circulation line or path, with a nozzle at its lower end; a second outlet, extending from the supply tank to the sump tank, described as the primary path or circulation line, through which the emulsion, by gravity, flows from the supply tank to the sump tank: (4) a nozzle, at the lower end of the first outlet (the secondary path or circulation line) furnished with a compressed air line which ejects, at the desired pressure, the emulsion against the article to be abraded or polished.

The primary object of this circulatory system is to insure constancy in the constitution, agitation and distribution of the emulsion. There is, also, as the emulsion is pumped from the sump tank into the supply tank, a constant renewal of the supply of emulsion, while the emulsion is expended through the nozzle against the object to be abraded or polished.

For centuries, sand and similar gritty substances have been used to clean, scour and polish, and, during the nineteenth century, varying types of pumps were employed as a mechanical means of projecting the sand against the article to be abraded or polished. Since fine sand does not flow easily, due to frictional resistance of its particles, it was not unusual to suspend the sand in water to secure a ready flow. Even in wet sand machines, the sand tends to settle out of liquid suspension if nothing is done to keep the sand stirred. Among the agitating devices commonly employed have been jets of air or steam and mechanically operated paddles. The demand for these wet blast machines appears to have been comparatively small until World War II, when, particularly as to the parts of airplane engines, the demand took a spirited upward jump. It could hardly be said, then, that the Eppler patent was in any sense revolutionary.

Application for the Eppler patent was filed January 8, 1944. After a lengthly

prosecution during which many of its claims were finally rejected as unpatentable over the prior art, by both the Examiner and the Board of Appeals, the patent issued February 22, 1949. Its file wrapper is of interest for at least two reasons—first, much of the most pertinent prior art was overlooked by the Patent Office, and—second, such art as was cited necessitated substantial amendments to the claims before they were allowed. The purported invention described and claimed in the original application was in many respects quite different from that which the patent claims and specifications were ultimately directed.

■ Pangborn's first attack on the validity of the claims in suit is that these claims are too indefinite. On this point, the District Judge stated:

"As respects the remaining ground of defense to the charge of infringement, namely, that the two claims in suit are not sufficiently definite, we are satisfied that the contrary is true. But, in any event, in view of our finding that Eppler is anticipated by Mathewson, this point becomes immaterial."

And, in the concluding paragraph of the opinion below, we find (as has been already quoted): "these claims are sufficiently specific in the light of the specifications". We think this ruling of the District Court must be upheld.

Under the applicable patent statute, 35 U.S.C.A. § 33, the inventor must "particularly point out and distinctly claim the part, improvement, or combination which he claims as his invention or discovery." And, see, Graver Tank & Mfg. Co. v. Linde Air Products Co., 336 U.S. 271, 277, 69 S.Ct. 535, 93 L.Ed. 672; United Carbon Co. v. Binney & Smith Co., 317 U.S. 228, 236, 63 S.Ct. 165, 87 L.Ed. 232; General Electric Co. v. Wabash Appliance Corporation, 304 U.S. 364, 368, 58 S.Ct. 899, 82 L.Ed. 1402.

True it is that the claims in suit are couched in general terms, with rather broad functional words. Particularly is this true of Claim 15, the process claim. But when, as they must be, these claims are construed in the light of (and narrowed by) the elaborate specifications, the claims live up to the statutory test. We think one skilled in the art would have little difficulty, upon a reading of the patent, in determining "the part, improvement or combination" which Eppler "claims as his invention or discovery."

■ The heart of this case is the correctness of the District Court's determination that the claims in suit of the Eppler patent are invalid for lack of invention under the prior art. We think this determination is clearly correct. In reaching this conclusion, we are not unmindful of two points stressed by Vapor's counsel: the presumptions in favor of validity arising from the issuance of the Eppler patent by the Patent Office and the favorable evidentiary value of commercial success of the Eppler machines. In Jungersen v. Ostby & Barton Co., 335 U.S. 560, 567, 69 S.Ct. 269, 272, 93 L.Ed. 235, Mr. Justice Reed said: "The fact that this process has enjoyed considerable commercial success, however, does not render the patent valid. It is true that in cases where the question of patentable invention is a close one, such success has weight in tipping the scales of judgment toward patentability. * * * Where, as here, however, invention is plainly lacking, commercial success cannot fill the void." See, also, Toledo Pressed Steel Co. v. Standard Parts, Inc., 307 U.S. 350, 356, 59 S.Ct. 897, 83 L.Ed. 1334; Sylvania Industrial Corporation v. Visking Corporation, 4 Cir., 132 F.2d 947, 951.

We think it unnecessary to add much to what was said on this question in the opinion below. The District Judge relied heavily in the prior art, on the English patent to Mathewson, No. 6446, granted in 1889. Mention was also made by the District Judge of the United States patents to Tilghman, No. 415,239, granted in 1889, and to Schellenger, No. 2,022,481, granted in 1935. And years before Eppler, the Macleod Company of Cincinnati made and sold machines embodying many of the elements used by Eppler. In Mathewson, Tilghman, Schellenger and Macleod are

disclosed a sump for the aqueous suspension of the abrasive material; a pump of some nature to force the suspension from the sump into the nozzle; a drain to effect the return of used suspension to the sump; some conventional agitating means to prevent the abrasive material in the suspension from settling. Other patents in this field are Darling, No. 1,746,228, Fitch, No. 2,277,341, and Doane, No. 2,301,203. It follows that Eppler made little advance over the prior art.

In the Mathewson patent, we find: "The object of this invention is to increase the rapidity of the operation, to secure a finer kind of frosting than heretofore, and to provide apparatus for effecting the same. To this end, I use sand in the form of very fine powder (preferably as fine as flour), mixed with water or other liquid to form a fluid abrasive mud, which can be fed evenly and regularly. This mud is propelled or projected against the glass by a jet of steam, air, or gas, at considerable pressure, or the desired velocity may be given in any other known way."

The Tilghman patent states:

"The receptacle or reservoir for containing the powdered sand and water may be either above or below the level of the gun, and it is not of course essential that it should be the same receptacle as that into which the mixture falls after striking the glass being operated upon.

"The supply for the jet may be drawn in by the ejector-like action of the steam-jet, or it may flow in by gravity or be forced in by a pump.

"In order to maintain this mixture in a homogeneous state and prevent the powdered sand from settling, an agitator should be used * * *."

In the light of all these disclosures, there is manifest error in the basic statement in Eppler's patent: "In the past, liquids have been used as carriers for abrasive materials, but in general the abrasives have been introduced in the carrier at the nozzle, and *in no instance has the abrasive been in suspension in the carrier.*" (Italics ours.)

And, particularly apposite, in this connection, are the words of Circuit Judge Soper, speaking for our Court, in Remington Rand Business Service, Inc. v. Acme Card System Co., 4 Cir., 71 F.2d 628, 635: "It is not necessary, however, for the purpose in view, that the Anchell patent be considered a complete anticipation to the patent in suit. It is sufficient that it suggests to one interested in the problem the means of solving it. When we consider the result which Soans was striving to achieve, and note the comparative simplicity of the problem, it is clear that it did not require invention to solve it in view of the suggestions in the kindred art contained in the Rudolph and Anchell patents." See, also, New Process Fermentation Co. v. Maus, 122 U.S. 413, 418, 7 S.Ct. 1304, 30 L.Ed. 1193; Gulf Smokeless Coal Co. v. Sutton, Steele & Steele, 4 Cir., 35 F.2d 433.

Great stress is laid by Vapor's counsel upon Eppler's overflow pipe and the unique part it plays in Eppler's double-ring primary and secondary circulatory system. And, we are told, Mathewson's overflow pipe was purely accidental and without any anticipatory effect. With this we cannot agree. Normally and naturally, the very idea of a gravity feed tank would suggest an overflow pipe to maintain a constant discharge level. It is not without significance that neither of the Eppler claims in suit, 15 and 21, in terms mentions an overflow pipe. And, as the District Judge aptly observed: "Even though Mathewson may not have contemplated the same value to be attached to such a pipe as did Eppler, he did disclose it in form and in operation as Eppler has done and therefore, it is not to be ignored in determining the similarity of the two devices."

We agree with the District Judge's summary: "The demonstrations given to the Court of plaintiffs' cabinet in actual, normal operation, clearly indicate that it and Mathewson's device are (1) substantially the same in construction, that is to say that any one of the several alternate constructions permissible under both Eppler and Mathewson mount up to the same thing;

(2) they operate in substantially the same manner, and (3) they produce the same result in the same branch or field of the same art. In short, here we have a case where it is true, apparently, that Mathewson did not contemplate the intensive, varied uses to which the abrasive art has in more recent years become commercially and very profitably applicable; but he did disclose to the world a machine which will perform these very same modern operations in the same manner as does the Eppler device."

■■ In a very recent case in this field, the Supreme Court has set forth its ideas as to the high standard which must be used in judging what constitutes patentable invention. In Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corporation, 71 S.Ct. 127, 130 Mr. Justice Jackson said: "The function of a patent is to add to the sum of useful knowledge. Patents cannot be sustained, when, on the contrary, their effect is to subtract from former resources freely available to skilled artisans."

And even stronger are the words of Mr. Justice Douglas in the same case: "Every patent is the grant of a privilege of exacting tolls from the public. The framers plainly did not want those monopolies freely granted. The invention to justify a patent had to serve the ends of science—to push back the frontiers of chemistry, physics, and the like; to make a distinctive contribution to scientific knowledge. That is why through the years the opinions of the Court commonly have taken 'inventive genius' as the test. It is not enough that an article is new and useful. The Constitution never sanctioned the patenting of gadgets. Patents serve a higher end—the advancement of science. An invention need not be as startling as an atomic bomb to be patentable. But it has to be of such quality and distinction that masters of the scientific field in which it falls will recognize it as an advance." 71 S.Ct. page 131.

The judgment of the District Court is affirmed.

Affirmed.