**WATSON et al. v. HEIL et al.**

No. 4946.

United States District Court
D. Maryland, Civil Division.

March 1, 1951.

Lawrence Perin (Semmes, Bowen & Semmes) Baltimore, Md. Clarence Kerr, Donald W. Robertson and William F. Moss, III all of New York City, for plaintiff.

George E. Kieffner (Kieffner, Stinchcomb & Royster) Baltimore, Md. Herman Seid, New York City, for defendant.

CHESNUT, District Judge.

This is another patent infringement suit. The principal defense is invalidity of the patent. If the patent is valid it has been clearly infringed. There is another defense set up by way of including a counterclaim, which will be later noticed. The principal facts developed by the evidence, as I find them, are as follows:

1. The plaintiffs are Orla E. Watson of Kansas City, Missouri, patentee, and Telescope Carts, Inc., a corporation of Missouri, with a regular place of business at Kansas City, Missouri, and having exclusive rights under agreements with Watson, set forth in plaintiffs' Exhibits 2 and 3.

2. The defendants are Henry Heil and J. Henry Heil, both citizens of the State of Maryland, doing business as Henry Heil, a partnership. They own and operate two grocery stores, one at 3624 Falls Road and the other at 5924 York Road, Baltimore, Maryland.

3. On August 16, 1949 United States patent No. 2,479,530 was issued to plaintiff Watson upon an application filed September 27, 1946. The defendants in this action are charged with infringement of claims 3, 7, 17 and 19 thereof.

4. The patent pertains to a grocery cart of the type used in super markets wherein a customer wheels such a cart around the market to convey purchases of groceries from different points in the market to the check-out counter where the cart is unloaded and then pushed aside to be used by another customer.

5. The patented cart includes two upright frame members attached to a horizontal base support which is mounted on wheels, the upright frame members being connected at the top by a handle for pushing the cart. In addition, two metal basket supports, one above the other, are connected to the upright frame members, slanting upwardly. All such elements are conceded to be old and were used in grocery carts more than one year prior to the filing date of the patent in suit.

6. In the patented cart, the basket supports are tapered and support a basket conforming to such taper, and the basket is provided with a hinged gate at the rear, as shown in Figure 3 of the patent. Such a tapered frame and basket structure equipped with a swinging gate enables the carts to be nested together to save storage space in a super market and this is the feature which plaintiffs contend constitutes patentable subject matter.

7. In practice, only an upper tapered frame and basket structure is usually employed. The bottom structure has been replaced by a support which slopes downwardly from the upright frames as illustrated in plaintiffs' Exhibits 5(a) and 5(b) showing the carts used by defendants in their Falls Road store. The use of such downwardly sloping support at the bottom is as effective as the upwardly sloping structure above in nesting of the carts.

8. Also in practice, tapered baskets alone are employed instead of separate baskets and basket supports, and in such cases, the baskets are affixed or attached to the upright frame members, also as shown in plaintiffs' Exhibits 5(a) and 5(b) showing the carts used by defendants in their Falls Road store.

9. Dellert patent No. 1,941,340 issued December 26, 1933, for the nesting of chairs shows the principle of the patent in suit required for nesting grocery carts

together. It shows a frame with one end of the frame narrower than the other end of the frame, so that converging sides provide a tapered frame structure, as shown for example in Fig. 4 of this Dellert patent, which is no different in principle or function from the nested tapered frames with converging sides shown in Fig. 1 of the patent in suit. This Dellert patent also shows both upwardly and downwardly sloping members for enabling complete nesting together of any number of frames.

10. Defendants' Exhibits 107 (a and b) and 108 (a and b) are frames based upon the disclosure in Dellert patent 1,941,340 and show how these frames may readily support baskets conforming to the frames, so that any number of them may be nested together as in the patent in suit.

11. Dellert patents 1,911,224 and 2,004,934 show nesting chair frames in somewhat different forms.

12. The catalog of Telescope Carts, Inc., Defendants' Exhibit 110, shows an outwardly projecting frame with extended sides integral therewith to form a carriage or basket for holding merchandise which otherwise might fall off. A frame with such expanded metal extensions serves the same purpose as a separate frame supporting a separate basket shaped to conform with the frame, or a basket alone shaped the same way and attached to the upright members of the cart.

13. The use of a hinged gate which may be pushed upwardly and then falls back in place is shown in the patent to Barton, No. 665,847, issued January 8, 1901, where such a gate made of sheet metal is designated B'; and also is shown in the patent to McKay, No. 371,693, issued October 18, 1887 where a similar gate C made of wire bars is shown; and in patent to Oliver, No. 111,771, issued February 14, 1871 where similar gates of wire I and J are disclosed. These devices are for animal traps.

14. The patent in suit, while pending prior to issue, was involved in an interference in the United States Patent Office, No. 83,565, with two applications of Mr. Sylvan N. Goldman of Oklahoma City, Oklahoma, Serial No. 25,262 filed May 5, 1948 and Serial No. 71,703 filed January 19, 1949. The interference was not adjudicated by the Patent Office. The plaintiffs and Goldman settled the interference under various agreements set forth in defendants' Exhibit 109, whereby Goldman assigned his said two patent applications to Watson, who abondoned them, and Goldman's Folding Carrier Corporation received a license containing various restrictive covenants, also included in defendants' Exhibit 109. Goldman's sworn statements in said interference and exhibits submitted therein, are that Goldman reduced to practice in 1942 a number of telescoping carts which nested together, each having a sloping frame, said frame being tapered by reason of converging sides so that the front of the frame was smaller than the rear of the frame, as in the patent in suit.

15. The Archer Iron Works of Chicago, Illinois, between 1917 and 1925 produced and sold throughout the country thousands of truck bodies containing every essential element claimed for the nesting structure of the patent in suit. These truck bodies were tapered so that they were wider at the rear than at the front and also tapered downwardly so that they were wider at the top than at the bottom. In addition, many of them were equipped with swinging gates which rested against stops. Such truck bodies equipped with such gates were nested together one inside the other by pushing one body into the other, whereupon the gate in the first body was pushed up, the same as in the patent in suit. Such nesting was done to conserve storage and shipping space.

16. The testimony of Messrs. A. T. Scannell and J. F. Kacena, supported by defendants' Exhibits 100, 101, 102, and 103 (a, b, c, d), constituting the original drawings, models of the truck bodies as made between 1917–1925, and invoices covering sales thereof, stand uncontradicted with respect to such prior use of the Archer Iron Works.

17. S. N. Goldman, President of Folding Carrier Corporation, obtained from plaintiffs the agreement dated June 2, 1949 (contained in defendants' Exhibit

109) and secured thereby a major practical interest under the patent, as licensee.

18. The only evidence of record in the Patent Office with respect to priority between Watson and Goldman is that submitted by Goldman showing conception and reduction to practice in 1942 by Goldman.

19. Neither patentee, Watson, nor Mr. Goldman appeared in court.

20. Before consummating the agreement between Goldman and Telescope Carts, the latter had granted unlimited sublicenses to Campbell-French Co., to John Chatillon & Sons, and had granted to Binkley Company a license for a specified quantity and time. In consequence of the agreement with Goldman which resulted in abandonment of Goldman's patent application and the issuance of the patent to Watson, Telescope Carts granted a sublicense to the Goldman corporation, the Folding Carrier Corporation, with the provision therein in substance that no other sublicenses would be granted by Telescope Carts without the former's consent. Pursuant thereto, Telescope Carts refused to grant sublicenses to many applicants therefor. Since then the Folding Carrier Corporation has manufactured by far the major portion of the grocery carts made under the patent and has paid therefor very substantial royalties.

21. Defendants admit that since the issue date of the Watson patent, August 16, 1949, they have used continuously baskets and carts manufactured by the United Steel and Wire Co., and American Wire Form Company. They are charged to have infringed Watson's claim 19 and claims 3, 7, and 17. Defendants received sufficient notice of alleged infringement.

22. The Watson grocery cart has had a very marked commercial success. When two of said grocery carts are nested together they occupy floor space approximately equal to one hundred and twenty percent of that occupied by one alone. As a number can be stacked together, considerable floor storage space can thus be saved. Grocery carts of this kind, as now made by the Folding Carrier Corporation or some other sublicensee of Telescope Carts, and also those which, according to the evidence, are now being similarly made by other manufacturers not sublicensed by Telescope Carts, have proven useful and desirable, and in large part, have superseded the use of the type of grocery cart heretofore used which employed movable baskets on a mounted frame or carriage. It is inferable, however, from the physical exhibits in the case that the popularity of this new type of cart is due in some substantial part at least to refinements, to improvements in the manufacture and in the use of aluminum and the ease of pushing by the customer by virtue of their lightness in construction and smoother wheeling.

My conclusion of law on the whole evidence is that the Watson patent in suit is invalid for want of invention; and also that the counterclaim must be dismissed for lack of sufficient evidence to sustain it.

The patent in suit was applied for September 27, 1946, issued August 16, 1949 to O. E. Watson (No. 2,479,530) and states:

"This invention relates to store baskets and carriages and more particularly to placing them in a compact form when not in use.

"Heretofore numerous folding carriages have been used for carrying store baskets and when not in use it was necessary to remove the baskets to be stacked in a pile and the carriages folded to save floor space.

"An object of the present invention is to provide wheeled carriages that will telescope one within the other when being wheeled to save floor space.

"Another object of the present invention is to provide telescoping baskets that will telescope in a horizontal sliding direction when the baskets are in their normal upright wheeled positions.

"Another object of the present invention is to provide store wheeled carriages with baskets thereon and the carriages and baskets telescoping together to save floor space without the removal of the baskets from the carriages.

"Another object of the present invention is to provide a basket with a hinged endgate therein to permit a like basket to telescope therethrough.

"With these and other objects in view the invention further consists of novel features of construction and arrangements of parts illustrated in the accompanying drawing, described in the specification and more fully pointed out in the appended claims."

Claims 3, 7, 17 and 19 are said to be infringed. Of these claims number 7 is the most comprehensive. The whole of it is set out in the margin.[1]

Although this claim is lengthily worded, in substance it describes merely a grocery cart with a basket integral with the frame mounted on wheels, a basket having four sides, and the horizontal forward projecting bars of the frame of the cart, connected with the handle, being *tapered* from the rear to the front, and the rear end of the basket, of wire construction, not being firmly affixed to the bottom of the basket, but hinged at the top, so that when another similar grocery cart is pushed forward into the rear of the former, the forward end of the basket of the second cart will contact with and force open or forward the hinged gate of the basket of the forward cart, and thus the two carts will nest one within the other.

It will be seen that the only features of this device that could possibly be considered as novel in any way are one, the tapering of the basket's sides (and other side frame members of the cart) so that one can telescope into or nest within the other; and two, the hinged rear end of the basket referred to in the claim in the following language: "An end-gate, means mounting said end-gate along the top at the rear of said receptacle and normally closing the rear end of said receptacle." The baskets, of course, have no top.

These two alleged novelties of construction do not in my opinion constitute invention. In substance, the patented device is merely a natural application of the old principle of nesting or telescoping multiple units of the same kind for the purpose of saving space in storage or in shipment. Familiar instances of this, long known in utilization, are paper cups, flower pots, ash and other forms of trays, wooden or metal baskets, and folding chairs. The only mechanical principle involved is that of the tapering sides. If vertical nesting is desired, as in paper cups or flower pots, the tapering of the sides must be from top to bottom, and if horizontal nesting is desired, the forward ends must be narrower than the rear ends. That is all that is required.

It would seem unnecessary to meticulously explore the wide field of prior art patents for disclosure of such simple well-known mechanical principles; but as heretofore indicated, prior patents for nesting of multiple units of various kinds are readily found; thus, Dellert, 1,941,340 (1933) shows by drawings and specifications a device for the horizontal nesting of certain types of chairs, an object quite analogous to the grocery carts here involved. Thus in his specifications Dellert said: "This invention relates to chairs, and particularly to chairs which may be readily nested, the object being to provide a chair which may be

---

1. A portable carriage which includes a pair of approximately vertical bars, a member comprising a front cross bar and side bars extending rearwardly from said front cross bar, said side bars being spaced farther apart at the rear than at the front cross bar and connected to said vertical bars at the lower part thereof, a receptacle, means attached to said vertical bars above said member for supporting said receptacle in front of said approximately vertical bars and in part between the same, the front of said receptacle being narrower than the rear thereof, the sides and bottom of said receptacle converging from the rear end toward the front end, the bottom of said receptacle being inclined to the horizontal to enable the receptacle to telescope into a like receptacle on an adjacent carriage of like construction, an end gate, means mounting said end gate along the top at the rear of said receptacle and normally closing the rear end of said receptacle, the top of said receptacle being open for the reception of merchandise, a pair of spaced casters mounted on said member at the front thereof and supporting the front of the carriage, and a pair of spaced wheels mounted on said approximately vertical bars and supporting the rear of said carriage, said rear wheels being spaced farther apart than said casters, by virtue of all of which one carriage will nest within another in a series of carriages of like construction.

nested by movement in a horizontal direction."

Other patents to Dellert are 2,055,340 (1936) and 1,911,224 (1933) applying the nesting principle to chairs of somewhat different kinds. Thus in his specifications in 1,911,224 Dellert says: "Another object of the invention is to provide an improved chair formed so that a plurality of identical chairs may be readily nested." In his specifications 2,055,340 Dellert says: "A further object, more specifically, is to provide a chair which may be nested with similar chairs wherein there is used a U-shaped frame with the front legs connected to the frame at the margin or lower edge of the frame so that the respective frames of a plurality of chairs may be slid together during the nesting action." Again, "This invention relates to an improved nestable chair, an object being to form a very simple and strong construction which may be readily nested with the legs resting on the floor."

There was also very credible evidence of two witnesses appearing in open court at the hearing who had been executives of the Archer Iron Works of Chicago. This company for some years prior to 1925 had manufactured, among other things, flat steel bodies for trucks. They applied at that time the principle of nesting or telescoping multiple units for economy in storage space and cost of shipment. The shallow sides of the truck bodies were tapered outward from the bottom to the top so that several vertical units could be nested one within the other. They also made truck bodies in which the rear end was wider than the front end so that the bodies could be nested one within the other horizontally. Some of these truck bodies were also equipped with a metal gate extending transversely across the middle of the truck body so that the whole of the truck body was divided into two separate compartments and could, if desired, therefore be loaded with two kinds of material, as, for instance two different sizes of coal. When used on a coal cart or dumping cart, the material in the rear compartment could first be dumped, and then in a separate action, if desired, the dividing gate, fastened at the bottom but hinged at the top, could be loosed and the contents of the other compartment dumped out through the gate. Of course, this device was used in what may be called a non-analogous or somewhat remote field, but it does clearly illustrate that the mechanical principles involved in this patent claim were known and in use thirty years ago.

The nesting principle for other articles is illustrated in other prior patents as, for instance, that of wire baskets in Boss, 1,032,180 (1912); and for flower pots in Lockwood, 1,971,075 (1934).

The only other alleged novelty of construction in the Watson cart is in the so-called end or swinging gate, but that is simply a gate hinged at the top and not affixed at the bottom. Surely the use of this old mechanical device cannot be considered invention. Swinging gates or doors, whether hinged at the side or at the top, are no novelty in construction or in use. Indeed that principle is so old that it is not surprising to find illustrations of it in former patents. Movable end-gates of various kinds of construction are found in illustrated patents for various types of animal traps, as above listed in the findings of fact. See, for instance, Victor Cooler Door Co. Inc., v. Jamison Cold Storage Door Co., 4 Cir., 1930, 44 F.2d 288. Such an elementary device as is here involved is, of course, quite different from the elaborate electrically controlled starting gate for horse races dealt with by the Fourth Circuit in Harford Agricultural & Breeders Ass'n v. Puett Electrical Starting Gate Corp., 182 F.2d 608.

Further discussion with regard to the invalidity of the patent seems unnecessary in view of the very recent opinion of the Supreme Court in the case of Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, at pages 149–153, 71 S.Ct. 127, 128, which in principle, in my opinion, governs this case. There as here the patent was claimed for a so-called "combination patent." Also the court there was, as here, dealing with a device for the greater convenience and economy in operation of a device used in a supermarket or grocery store. The device there involved was described by the court as follows:

"Stated without artifice, the claims assert invention of a cashiers's counter equipped with a three-sided frame, or rack, with no top or bottom, which, when pushed or pulled, will move groceries deposited within it by a customer to the checking clerk and leave them there when it is pushed back to repeat the operation. It is kept on the counter by guides. That the resultant device works as claimed, speeds the customer on his way, reduces checking costs for the merchant, has been widely adopted and successfully used, appear beyond dispute."

In discussing the legal tests for a patented invention resulting from a combination of old elements, the court said: "What indicia of invention should the courts seek in a case where nothing tangible is new and invention, if it exists at all, is only in bringing old elements together? * * * It is agreed that the key to patentability of a mechanical device that brings old factors into cooperation is presence or lack of invention. * * * The concept of invention is inherently elusive when applied to combination of old elements. * * * Elements may, of course, especially in chemistry or electronics, take on some new quality or function from being brought into concert, but this is not a usual result of uniting elements old in mechanics. This case is wanting in any unusual or surprising consequences from the unification of the elements here concerned, and there is nothing to indicate that the lower courts scrutinized the claims in the light of this rather severe test. * * * Courts should scrutinize combination patent claims with a care proportioned to the difficulty and improbability of finding invention in an assembly of old elements. The function of a patent is to add to the sum of useful knowledge. Patents cannot be sustained when, on the contrary, their effect is to subtract from former resources freely available to skilled artisans. A patent for a combination which only unites old elements with no change in their respective functions, such as is presented here, obviously withdraws what already is known into the field of its monopoly and diminishes the resources available to skillful men. This patentee has added nothing to the total stock of knowledge, but has merely brought together segments of prior art and claims them in congregation as a monopoly."

In the A and P case it was also said in the opinion: "The conjunction or concert of known elements must contribute something; only when the whole in some way exceeds the sum of its parts is the accumulation of old devices patentable."

■ Counsel for the patentee in this case contends that the combination here involved meets this test because one, the baskets not only nest lengthwise, but nest through the frames; and two, the baskets and the frames nest as set up for use. Heretofore, the baskets had to be removed and nested separately; but I fail to find this attempted distinction substantial or sufficient to constitute invention. As we have seen, the horizontal nesting of multiple units is old, and Dellert shows such horizontal nesting of chairs while the chairs are set up or, as he expresses it, resting on the floor. The phrase "nesting through the frames" merely refers to the raising of the hinged rear end of the basket. No doubt this was a useful improvement, but it was certainly one well within the ability of any skilled artisan applying his mind to the particular utility desired.

■ Counsel for the patentee also in this case relies very heavily on the commercial success of the device. As was frequently pointed out, this is an objective test as to patentability which in doubtful cases may swing the decision in favor of the patent; but this is not such a doubtful case. In the A and P case the device had undoubted commercial success. It had been widely adopted and successfully used, but this was not enough, and the court said, 340 U.S. at page 153, 71 S.Ct. at page 130:

"The Court of Appeals and the respondent both lean heavily on evidence that this device filled a long-felt want and has enjoyed commercial success. But commercial success without invention will not make patentability. Toledo Pressed Steel Co. v. Standard Parts, Inc. [307 U.S. 350, 59 S.Ct. 897, 83 L.Ed. 1334]. The courts below concurred in finding that every element here claimed (except extension of the counter) was known to prior art. When, for the first time, those elements were put to work

68

for the supermarket type of stores, although each performed the same mechanical function for them that it had been known to perform, they produced results more striking, perhaps, than in any previous utilization. To bring these devices together and apply them to save the time of customer and checker was a good idea, but scores of progressive ideas in business are not patentable, and we conclude on the findings below that this one was not."

See also Vapor Blast Manufacturing Co. v. Pangborn Corporation, 4 Cir., 1950, 186 F.2d 230.

■ It will be sufficient to refer briefly to the defendants' counterclaim. Defendants set up an additional defense to the alleged validity of the patent also in terms affirmatively asking damages against the plaintiffs for an alleged violation of the anti-trust act. The basis for this contention is a charge that in the Patent Office there was an interference proceeding between Watson, the patentee here, and Goldman, who is not a party to this case, who claimed priority in invention of the subject matter of the Watson device. Watson's application was filed in 1946, and he assigned his application to the Telescope Carts, a Kansas City corporation, who notified Goldman, then making or about to market a grocery cart, of probable infringement. Apparently stirred by this notice, Goldman filed his patent application in 1948, alleging priority in conception and in reduction to practice about 1942. He also filed an affidavit in the Patent Office, found in the record as defendants' Exhibit 109, which set out drawings and descriptions which, if correct, are seemingly in anticipation of Watson. But the interference proceeding was not litigated to a conclusion in the Patent Office because the parties made an agreement (referred to in a letter from the attorney for Telescope Carts as "a deal with Mr. Goldman") whereby Goldman agreed to have the controversy determined by the attorney for the patentee; and in result Goldman's patent application was withdrawn, and the patent in due course thereafter issued to Watson. Contemporaneously an agreement was entered into between Telescope Carts and Goldman, or his corporation, whereby the latter was given a sublicense with veto power over sublicenses to others without his consent except as to a small number theretofore issued by Telescope Carts.

Counsel for the defendants charges that these activities of Goldman and Telescope Carts constituted an unlawful conspiracy to monopolize the business and improper dealing with the Patent Office in that if the interference proceeding had been adversely contested by the parties, the result would have been that neither could have obtained the patent because, one Watson was anticipated by Goldman; and, two, Goldman's application was not filed within the required year after reduction to practice.

So far as the counterclaim is relied on as an additional defense against the validity of the patent, it is not necessary to discuss it further in view of the conclusion that the patent is invalid for want of invention. As an affirmative counterclaim for damages, the evidence does not establish that the defendants have sustained any damages which could be properly recoverable under the provisions of the anti-trust law. Therefore, the counterclaim will be dismissed.

Counsel may present the appropriate form of order for dismissal of both the complaint and the counterclaim. Costs are to be divided between the parties.