W. D. DODENHOFF CO., Inc.,
Appellant,

v.

GASTONIA TEXTILE MACHINERY
COMPANY, a corporation, Fiber Controls Corporation, a corporation, and
Charles Barnes, Appellees.

W. D. DODENHOFF CO., Inc.,
Appellant,

v.

PROCTOR & SCHWARTZ, Inc.,
Appellee.

Nos. 7017, 7025.

United States Court of Appeals
Fourth Circuit.

Argued Oct. 7, 1955.

Decided Dec. 27, 1955.

B. D. Watts, Cleveland, Ohio, and C. F. Haynsworth, Jr., Greenville, S. C. (Richey, Watts, Edgerton & McNenny, F. O. Richey, H. F. McNenny, Cleveland, Ohio, Haynsworth, Perry, Bryant, Marion & Johnstone, C. F. Haynsworth, Jr., Greenville, S. C., on the brief), for appellant in both cases.

David E. Varner, Washington, D. C. (C. Willard Hayes, Cushman, Darby & Cushman, Washington, D. C., on the brief), for appellees Gastonia Textile Machinery Co. and others. Charles H. Howson, Jr., Philadelphia, Pa. (Howson & Howson, Dexter N. Shaw, Philadelphia, Pa., F. Dean Rainey, Greenville, S. C., on the brief), for appellee Proctor & Schwartz, Inc.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

SOPER, Circuit Judge.

This case relates to the validity and infringement of United States patent No. 2,412,506 issued December 10, 1946 to Oren W. Greene, Robert W. Twitty and Therman L. Ritchie as assignors on an application filed May 1, 1945. Through various assignments of title the patent is now vested in W. D. Dodenhoff Co., Inc., which has been substituted as the sole plaintiff in both cases. In case No. 7017 Gastonia Textile Machinery Company, Fiber Controls Corporation and Charles Barnes are the defendants and in case No. 7025 Proctor & Schwartz, Inc. is the defendant. So far as the validity of the patent is concerned the cases are identical.

The patent relates to an apparatus for blending fibers in the manufacture of cloth containing synthetic fibers. It is highly important to get the right percentage of each of the component materials distributed evenly throughout the mass, so that all of the manufactured product will be uniform in strength, color and other characteristics. Many kinds of synthetic fibers are now available and the proper blending of them with natural fibers is of prime importance. Good mixing can be done by laying out different stocks over a floor area by hand, but the human element leads to error and the practice is expensive and may result in an uneven blend. The inventors sought to solve this difficulty by devising an apparatus to accomplish the process accurately and economically.

The apparatus described in the patent comprises a plurality of weighing machines, known as feeders, which are arranged in a line along side of a convey-

or. Each of these machines has a conventional feeding mechanism which consists of a spiked apron, that is, an endless belt with spokes projecting from one side to remove the fibers from a supply hopper and deposit them in a weighing container or scale pan attached to one arm of a scale beam which carries a weight on its other end. This device is set to weigh a predetermined weight of fibers. When the desired weight has been deposited in the container, the feeding mechanism is automatically stopped and no more fiber is deposited. The discharge of the fibers from the container is, however, held up until the weighing containers of all the machines have received their respective predetermined weights of material and thereupon the contents of all of the containers are simultaneously dumped automatically upon the conveyor. After this discharge the feeding mechanism of all the machines is automatically placed in operation again and the procedure is repeated.

An important feature of the patent is the means by which the discharge of the fibers from the containers upon the conveyor is held up until all of them have received their predetermined quotas. Each spike apron is driven by a motor which runs while the weight-carrying end of the scale beam is horizontal but stops when the scale beam tilts up on receiving its portion of fiber. Each feeder is equipped with a solenoid switch which is open when the scale beam is horizontal and closed when the scale beam is tilted. Each scale pan has a solenoid to open its doors forcibly and thereby eject the material. The last mentioned solenoids are not energized until every scale pan has received its quota and then all the pans are dumped and the scale beams return to the horizontal position and the feeder motors are energized and the operation proceeds as before. An electrical circuit includes all the motors which drive the spike aprons; another electrical circuit includes all the solenoid switches and solenoids.

Claim 2 which is typical of the patent reads as follows:

"Fiber blending apparatus comprising a plurality of fiber preparation machines, each having individual means for driving the same and each having a discharge opening, a fiber receiving container disposed below each of the discharge openings for receiving the fibers discharged from the machines, means operable by the weight of the fibers in each container associated with each machine for stopping the machine with which a container is associated when a predetermined weight of fibers is received into the container, and means automatically operable when all of the containers have received their predetermined weight of fibers therein for automatically discharging the fibers from the containers."

The main question is whether the construction of this apparatus involved invention. We think it does not in view of the prior art. Significant of the prior art discoveries is that the feeder disclosed in the Bramwell patent, No. 216,-373 of 1879 for it shows that machines for feeding and weighing successive batches of material of a predetermined weight did not originate with Greene. The evidence shows that Bramwell's structure had been standard equipment for handling fibers in the textile field for many years. This invention related to the automatic feeding and delivery to carding—engines and other preparing machinery, of wool, cotton and fibrous materials in general, having special reference, however, to the feeding of long wool. The mechanism was designed to overcome the objection inherent in earlier methods that the wool was delivered by bulk and not by weight, so that the resulting sliver was of unequal weight in parts. The great object of the patented mechanism was the production of a yarn which would have a certain weight for each unit of measure so that the tissue made therefrom would be of uniform weight throughout.

In order to feed the wool in such a way that equal weights in equal areas should be presented more uniformly,

Bramwell devised a feeder of the following description. It comprises a conveyor which elevates the fibers from the receptacle of the feeder and deposits them in a weighing pan or scale. When the required weight has been deposited, further delivery of fibers is presented automatically by the drop of the scale pan which opens a clutch and stops the conveyor. The scale pan is dumped at regular intervals so as to discharge its contents upon the conveyor. This is accomplished by means of a gear which revolves at a constant speed and carries a pin which actuates a lever and causes it to open the pan. After the pan has been dumped it closes automatically and the pin actuates the lever to reengage the clutch and again start the feeder conveyor to deliver the fibers to the scale. The result is that a predetermined weight of fibers is discharged periodically at regularly fixed intervals of time. In the course of the years mechanical improvements have been introduced in the structure and the clutches of the earlier machines have been replaced by electrically controlled motors and switches.

It will have been noticed that the Greene patent in suit, unlike the Bramwell process, calls for the employment of a plurality of feeders or weighing machine to weigh a plurality of batches of fibers of predetermined weight, and to discharge them simultaneously upon a conveyor, and at the same time to hold up the simultaneous discharge until all of the machines have received their allotted weights of material.

The patentees of the patent in suit, however, were not the first to employ a plurality of feeders in combination to weigh a plurality of batches of material and then discharge them simultaneously. Proctor and Schwartz, Inc. had already made and installed equipment which comprised these features at the Mohawk Carpet Mills of New Amsterdam, New York, and the Bibb Manufacturing Company of Macon, Georgia, and the patent to Howe No. 1,733,225 of 1929 provided not only for a plurality of feeders to be simultaneously discharged, but also for the retention of the material in the scale pans until each of the feeders had received its allotted quota. There is no dispute that these installations were made. The plaintiff's comment is merely that the machinery employed was so inaccurate that the weight would vary as much as two and a half per cent whereas only one and a half per cent of inaccuracy was the maximum tolerance permitted by the industry.

The most important reference cited against the validity of the patent in suit is the Richardson patent No. 1,066,656 of 1913 based upon an application filed in 1909. The apparatus of this patent not only involves a combination of a plurality of feeders which are discharged simultaneously, but also an arrangement which prevents the discharge of any of the machines until all of them have received their predetermined weights. Since the arrangement in the Richardson patent is so suggestive of the patent in suit, and parallels it so closely, a detailed description of the apparatus is desirable. It comprises a plurality of weighing machines each of which has a hopper or container with a bottom opening which is closed by a door and has feed means operated by a motor for transferring material to the weighing hopper or scale to be weighed. Each machine has a switch which is opened to stop the motor and prevent the deposit of additional material after the correct weight has been deposited on the scale. Each machine has a solenoid which remains energized and holds the hopper doors closed until all of the machines have received their predetermined weights. This is done by connecting the discharged solenoids with switches so that as long as one of the switches remains closed the solenoids will be energized to keep the hopper doors closed. When the hopper of one of the machines has received its correct weight, the hopper descends causing the switch to open and thereby stopping the motor and preventing the deposit of additional materi-

al. Meanwhile the feed motors of other machines continue to run but the moment that the last machine has received its weight the descent of its hopper stops its motor and also breaks the circuit through the solenoid, whereupon a simultaneous discharge occurs.

It is conceded that the Richardson scales were widely used by textile companies but it is contended that this patent does not anticipate or invalidate or suggest the patent in suit for a number of reasons. First it is said that in commercial use the apparatus has been confined to the handling of solid or free flowing materials and has never been used or sold for weighing wool fibers, while the Greene machine provides for the rapid handling of small amounts of different synthetic fibers which do not flow or roll freely and will not slide on gently inclined surfaces but tend rather to cling together. Second, it is pointed out that the feeding mechanism of the Greene patent includes a spiked apron to tear the fibers from a bale, a comb which removes the excess fibers and a doffer which forcibly removes the fibers and propels them vertically down into the scale pans. On the other hand, the Richardson scales include a gently sloping vibrating chute into which free flowing solenoids pass into the hopper; and it is contended that there is no proof that fibers could be fed into such a chute. Third, the scale pans of Greene have large inlets and outlets and parallel walls while the Richardson hopper has small inlets and outlets and converging walls leading to the outlets which tend to impede the discharge of the fibers. Fourth, it is said that the solenoids in the Greene patent are used forcefully to open the scale pan doors and are equipped with springs to close them quickly, while the Richardson scales are opened slowly by the force of gravity and are closed slowly by the force of gravity acting on counterweights on the doors. Fifth, it is said that the Greene patent has two electrical circuits one of which operates the motors of the feeders and the other operates the solenoids and solenoid switches to the doors, while the Richardson doors have but a single circuit which includes all the motor switches and solenoids. It is contended that by reason of these differences the Richardson apparatus cannot anticipate or even invalidate the patented invention of Greene.

The appellant not only emphasizes the mechanical differences between the Richardson and Greene structures, but makes much of the circumstance that Greene first solved the problem caused by the increased use of synthetic fibers and the need to blend them properly in the production of cloth. The contention is that there was a serious demand for efficient equipment for this purpose long before 1945 and hence more than ordinary skill was needed to find the solution for which the industry was searching. The patentees filed their application for the patent on May 1, 1945 and Proctor & Schwartz did not put a successful machine on the market until 1950. It is claimed that in the year 1940 or thereabouts the business of handling synthetic fibers in the manufacturing operation became important, and that the difficulties in handling rayon fibers on the inaccurate Bramwell machine became apparent so that efforts were made by producers of automatic weighing equipment, including Proctor and Schwartz, Inc., to construct an effective machine to handle the mixture. Certain articles published in 1947 and 1949 by Proctor and Schwartz indicate that much research and experiment was used to develop efficient machinery to this end. The gist of the contention is that Greene et al. were the first to solve the problem with which the industry was struggling and hence their successful efforts involved the exercise of inventive genius which justified the issuance of the patent.

The evidence offered by the defendant on the other hand tends to show that the problem occasioned by the use of synthetic fibers did not occupy the attention of the industry for a long period before

it was solved. This testimony was that, although synthetic fibers were used in increasing amounts from 1936 on, the great demand for mechanical apparatus to blend them in definite proportions came after the Second World War when the mills swung over to yarns and fabrics made from a mixture of synthetic fibers, and the rising labor costs created a demand for machinery to increase production. Witnesses for Proctor & Schwartz, Inc., which is one of the large manufacturers of equipment in this country, testified that there was no widespread demand before 1945 and when it did arise it was met both by the patentees and somewhat later by their own corporation. The evidence indicates that no sales of the patented apparatus were made until 1950 although it was discovered more than five years previously. The defendant's machine, alleged to infringe in this case, was put on the market in the same year. In resolving this conflict in the testimony the court made the following finding, which we find no reason to reject:

"There was no long existing demand in the industry for apparatus for proportioning fibres. The defendant, one of the largest textile machinery manufacturers in the country, did not experience any demand for such apparatus until 1945. Actually there was no demand for apparatus for proportioning fibres until the close of World War II when the mills began to seek equipment for handling synthetic fibres not available during the war. Furthermore, when the demand for proportioning apparatus did arise the need was met by the patentees by the apparatus of the patent in suit and by the defendant, acting entirely independently of the patentees, by apparatus which differed in construction and principle of operation from the apparatus of the patent in suit."

This conclusion brings us to the question whether the Greene structure involved patentable invention in view of what is shown by the Bramwell and Howe patents and by the installations of Proctor & Schwartz, Inc., and particularly by the disclosures of the patent to Richardson. The District Court specifically found that no invention was required to adapt the Richardson scales to the weighing and discharge of synthetic fibers in view of the history of the prior art. We are in accord with this conclusion. The mere recital of the differences between the Greene and Richardson structures, which were listed by the appellant and are set out herein in some detail, shows the lack of invention for it required nothing more than ordinary skill to substitute for the feeding means of Richardson the well known fiber feeding means which had been used in the industry long before the Greene arrangement had been devised. See Cuno Engineering Corporation v. Automatic Devices Corporation, 314 U.S. 84, 62 S.Ct. 37, 86 L.Ed. 58; Remington Rand Business Service v. Acme Card System Co., 4 Cir., 71 F.2d 628; Vapor Blast Mfg. Co. v. Pangborn Corp., 4 Cir., 186 F.2d 230.

Since the patent is invalid, we have no occasion to consider the question of infringement in the two cases before us on this appeal. The judgment in both cases will be

Affirmed.