**AMERICAN PHENOLIC CORP.**

v.

**POLLARD et al.**

Civ. A. No. 6377.

United States District Court,
D. Maryland.

June 15, 1954.

Carroll F. Fitzsimmons and John B. Russell, Baltimore, Md., and Casper W. Ooms and Dugald S. McDougall, Chicago, Ill., for plaintiff.

Oscar W. Zenitz, Baltimore, Md., and William R. Liberman and Milton H. Gross, New York City, for defendants.

COLEMAN, Chief Judge.

This is a patent infringement case involving patent No. 2,543,696, for high frequency transmission cable, issued February 27, 1951, to the plaintiff, the American Phenolic Corporation, as assignee of R. J. Krueger, inventor.

The plaintiff is an Illinois corporation with principal place of business in Chicago, and manufactures high frequency transmission cable for use in television installations. One of the defendants, the Plastoid Corporation, is a New York corporation engaged in the same manufacturing, and has sold to the other defendant, Charles R. Pollard, Jr., doing business under the name of Lytron Distribut-

ing Company, in Baltimore, as a dealer in television supplies, its cable which the plaintiff corporation claims infringes the Krueger patent.

Defendants deny infringement and also by way of defense assert invalidity of the Krueger patent which embodies 11 claims, but only 7 are in suit, namely, Nos. 1, 3, 4, 5, 9, 10 and 11. Claim 1 is the broadest. It is typical of claims 4 and 5, and reads as follows: "1. A cable for the transmission of relatively high frequency electric currents which comprises an elongated hollow tube constructed of a dielectric material, the walls of the tube being relatively thin compared to the tube diameter, and a plurality of electric conductors imbedded in opposite walls of the tube, said conductors being substantially coextensive with the length of said tube." The Krueger cable is used for connecting the antenna and the television set, in order to carry or lead-in the television signal energy, and is thus described in the introduction to the specifications of the patent: "This invention relates to improvements in multiple-lead transmission cables and refers particularly to a cable of this class wherein the field between the leads is largely air, the cable being so constructed that moisture, water, ice or other substance detrimental to the efficiency of the cable as a transmission agency can never lodge between the leads constituting the cable.

"Multiple-lead cables for transmission purposes have heretofore been proposed, but substantially all have been characterized by having the leads separated by an excessive amount of solid dielectric material and the forms of said cables have frequently been such that when exposed to weather conditions moisture, water, ice, snow or other 'high loss' materials could lodge on the surface of the dielectric material separating the leads and within the electric field. In view of the fact that the field between such leads is most intense directly between the leads or conductors, the interpositioning in the field of the conductors of such 'high loss' material or materials not approaching the dielectric characteristics of air results in low transmission efficiency.

"As a feature of the present invention, the leads or conductors of the cable are embedded in diametrically opposite walls of a tube of dielectric material. The dielectric material employed is sufficiently stiff to prevent collapsing of the tube in normal use and is preferably a material which is weather-resistant and has per se good dielectric properties. By virtue of the position of the conductors in the tube walls, they will always be spaced a relatively constant distance from each other and the space between them is largely constituted of air being included between and shielded by the curved tube walls which are bisected by a plane disposed at right-angles to the plane of the conductor centerlines."

As developed at the hearing, the antenna which picks up the television signal energy from broadcasting stations is usually located on the roof of the building in which the television set is located. The lead-in cable from the antenna to the set must have a pair of parallel conductors or wires, insulated one from the other, but mechanically held at a constant distance apart. In the early stages of the television industry a so-called flat, twin-lead or flat-line cable was commonly used, consisting of a pair of wires separated by a thin solid web of plastic, known as polyethylene. As long as such lead-in remained clean and dry, it performed satisfactorily. It was also found highly desirable that the lead-in cable be very flexible, in order to permit it being passed over eaves and through windows, as well as light in weight, in order to permit it being readily carried up ladders and on roofs, and, at the same time, it was necessary that it be strong enough to withstand inclement weather, involving wind and ice.

The flat twin-lead cable did not prove satisfactory for outdoor installation in many areas because, after a period of weathering, it became covered with deposits of foreign matter, the character of which varied with the location. For

example, along the seaboard, salt and moisture would accumulate, and in inland areas or where coal and oil were used extensively for heating, there would be deposits of soot, sulphur and various chemicals. Thus, this foreign matter, lying on the surface of the plastic cable between the two wires, greatly reduced the cable's effectiveness and often resulted in poor reception, especially in locations a considerable distance from the broadcasting stations. As a result, during the years 1946, 1947 and 1948, when there was a great expansion in the production and sale of television sets, and a great advance in the scientific development of them, the problem of how best to overcome the effect, as above explained, of the elements on lead-in cables became an important one to the industry.

Krueger claims to have solved the problem when in 1948, he conceived the idea embodied in his patent whereby a pair of wires are embedded in the opposite walls of a plastic tube, which is thin, yet of such thickness as will enable it to receive the wires and to have the necessary strength to hold its tubular shape when bent. The wires can be easily pulled away from the tube by skinning off a bit of the plastic from the outside of the tube, while the plastic inner walls remain unbroken after removal of the wires. Krueger also taught two methods for sealing off the top of the tube, one consisting of heating the end of the tube with, for example, a match, and squeezing the sides together so as to let them seal as they cool; and the other method consisting of the insertion of a plug in the end of the tube after the wires have been pulled back, and then making the plug firm by heat or cement.

The most significant feature of the Krueger tube is the provision of an air space directly between the two wires. As stated by Krueger in his patent, "It is well known that in the transmission of high frequency electric currents the electric field directly between the conductors is strongest and depending upon the dielectric [non-conducting] material in said field greater or lesser 'dielectric losses' will occur. It is also known that air is an excellent dielectric. In the present invention, it can be readily seen that the major portion of the field between the opposite leads comprises air". In addition, as Krueger explains, by reason of the tubular shape of the cable, "any foreign particles such as moisture, water, snow, ice, atmospheric dirt or the like which may deposit on the outer walls of the tube will be prevented from assuming a position between the conductors". Also, the Krueger cable is strong, light, flexible and affords easy access to the conductors or lead-in wires.

### Infringement

Turning first to the question of infringement, it is immediately apparent, by comparing the Plastoid cable with the Krueger cable, that the two are substantially identical in construction. Also, it is admitted that the way in which the Plastoid cable is used and the results obtained from such use are the same as those in connection with the Krueger cable. In fact, in the advertising used for the Plastoid cable the very qualities are claimed for it which we have above set forth as characteristic of the Krueger patent. Defendants do, however, assert that the Plastoid cable is to be distinguished from the Krueger cable because the former has no bead, that is, no thickening of that part of the wall of the tube through which the conductors pass. Also, defendants claim that they do not infringe claims 10 and 11 of Krueger because the shape of the Plastoid cable, while oval, is not "substantially circular". However, we consider these alleged distinctions are not substantial enough to avoid infringement of the claims referred to. As respects the bead, the model of the Plastoid cable introduced in evidence clearly discloses a bead. As respects the oval shape of both cables, the fact that the Plastoid cable does not have precise circularity simply indicates that the imitation is there, although it has been stopped short of being an exact, Chinese copy.

## Validity

Turning to the defense of invalidity, defendants assert three grounds: (1) that the Krueger patent lacks invention because anticipated by the prior art; (2) that its 7 claims in suit are indefinite; and (3) that in issuing the patent, the Patent Office was guilty of careless and incompetent procedure.

Taking up these grounds in the order stated, defendants rely upon five prior art patents which they allege anticipate Krueger. These are patent No. 290,375 to Waring, issued December 18, 1883, on application filed January 29, 1883; to Marsh, No. 466,250, issued December 29, 1891, on application filed September 30, 1891; to Holman, No. 469,248, issued February 23, 1892, on application filed October 10, 1891; to Affel, No. 1,996,186, issued April 2, 1935, on application filed October 5, 1932; and British patent No. 8,573 to Smith, issued March 7, 1896, on application filed April 30, 1895.

We will consider these patents in the chronological order given. First, is the patent to Waring. Clearly this patent does not anticipate Krueger. The weight of the Waring tube, since it is made of lead, would be prohibitive in connection with television use. Also, it would have entirely too little flexibility and its cost would be excessive. But the more important point is that in the Waring tube, if constructed according to the Waring specifications, the air space would not, and is not intended to be a non-conductor. Therefore, if the Waring tube, instead of being constructed of lead as the specifications provide, is constructed of polyethylene, this would change radically the electrical action, because an insulator would be substituted for a conductor. Without more, it seems perfectly obvious that that patent is not an anticipation of Krueger.

Next, we turn to the patent to Marsh. It is conceded that the Marsh cable could not be made by any extrusion method now known, that is, by pushing or expelling. Marsh calls for a hollow frame made "preferably of stiff paper or other suitable material" with a large air space between the two wires of a circuit and also between the wires of adjoining circuits. The patent also calls for covering the entire frame with a perforated binding-strip also "of paper or other fibrous material", and "the air inclosed in the pockets, formed by the perforations in the binding-strip efficiently insulates each wire of a circuit from the wires of adjoining circuits". Thus while the patent device does not exclude use for a single circuit, it appears to contemplate primarily a plurality of circuits in separate air-retaining cores. In any event, it is perfectly obvious that the Marsh tube would be highly impractical for out-of-door use. It could not withstand the elements. So Marsh in no sense anticipates Krueger.

Third, we turn to the patent to Holman. Here again there clearly appears to be no anticipation of Krueger. Holman provides for the laying of one or more pairs of copper wires parallel to and equidistant from each other, upon a strip of paraffin cloth with a similar strip over them. The two strips are then pressed firmly together, and the tape thus formed is coiled spirally into a tube or hollow cylinder. But the weight of the credible testimony shows that paraffin cloth is impractical for out-door use. It would be brittle and not sufficiently durable. Also, it would be impossible to produce the Holman tube by any extrusion method. All in all, it bears no real similarity in form, method of production or suitability for out-door use to the Krueger tube. The twisted form is the very essence of the Holman idea. Take that away, and interruption in the circuits would occur,—the very thing sought to be avoided.

None of the three patents thus analysed refers to television. The latest of the patents (to Holman) was not issued until 1892, long before we had any inkling of television.

We next turn to the patent to Affel, issued in 1935. Affel does specifically refer to the use of his device for high frequency transmission purposes in television. However, Affel calls for a rigid,

not a flexible cable, and also the specifications do not call for the wires to be embedded in the wall of the extruded tube. So, again, we find no anticipation of Krueger.

Finally, we turn to the British patent to Smith, upon which the defendants primarily rely to support their contention that Krueger is anticipated by the prior art. Smith, whose patent issued in 1896, upon application made in the previous year, constructed his tubular cable of gutta percha or like insulating material, with a central longitudinal air space, and with two or more wires embedded at distances apart in the gutta percha near to the inner surface of the tube. However, Smith covered each of the wires individually in a gutta percha jacket, having a concave surface; fitted the jackets together with their concave faces abutting, and then covered this assembly with two outer tubes of gutta percha. Thus, at least four separate operations were involved in the construction of the Smith tube. In other words, the wires were individually jacketed and access to them required that the walls of their separate tubes be wholly open. Therefore, sealing the end of the Smith cable by heat or by a simple plug, as taught by Krueger, was not possible. There is nothing to indicate that Smith had in mind, as one of his objectives, the sealing off of the end of his tube to prevent access of foreign matter to the air space between the wires. On the contrary, a United States patent, No. 597,-790, issued to Smith in 1898, which is largely a duplication of his British patent and which, with the latter, was before the United States Patent Office when the Krueger application was being considered, provides for the introduction of conductors into the air space for the purpose of promoting leakage of energy between the wires; and also for filling the air space with "wax, gum, resin or other liquid or solid material". Furthermore, the Smith cable was heavy and inflexible. In short, it had none of the physical characteristics of Krueger such as are needed in a television lead-in cable.

Thus, while the fact that a given device may have been invented, as was the Smith cable, long before television was conceived, does not, in and of itself, mean that such an earlier device might not be of practical use later on in connection with television, nevertheless, insofar as the Smith cable is concerned, we fail to find either that it is in any material respect similar to Krueger or that its form and method of construction indicate that it has any commercial value in connection with the television art.

■ Of the aforegoing five prior art patents, none of which we find, for the reasons just given, anticipates Krueger, only one, the British patent to Smith, is cited as a reference in the Patent Office file of the Krueger patent. The United States patent issued to Smith which we have analyzed and likewise find not to anticipate, was so cited. Also, two other patents, one to Beaver, No. 1,305,247, issued in 1919, and one to Safford, No. 2,379,318, issued in 1945, were before the United States Patent Office but these were not relied on by defendants at the trial as anticipating Krueger, nor do we find that they do in any sense anticipate Krueger.

Accordingly, we turn to a consideration of the second ground which defendants assert in support of their claim that Krueger is invalid, namely, that the 7 claims of this patent which are in suit are indefinite. We find that this contention is entirely lacking in merit. An examination of each of these 7 claims clearly indicates that their language is not indefinite, but sufficiently clear and precise and is supported by the detailed descriptions contained in the specifications of Krueger.

We now turn, therefore, to the third and last ground asserted by defendants. in support of their claim of the invalidity of the Krueger patent, namely, that in issuing this patent, the Patent Office was guilty of careless and incompetent procedure. This defense is based primarily upon an affidavit which counsel for plaintiff presented, under Rule 132 of the Patent Office, to the examiner in.

charge of the Krueger application, this affidavit having been made by one Ivan Pedersen, an electrical engineer of extensive technical education and practical experience, employed, at the time he gave the affidavit, as a senior engineer in the development laboratory of the plaintiff company.

We find nothing irregular either in the submission to or consideration by the Patent Office examiner of this Pedersen affidavit. Also, we find that the subject matter of the affidavit was material to the question whether or not Krueger's cable embodied something new and useful in the art as presented to the Patent Office. While this subject matter related largely to tests made by affiant as to the comparative characteristic impedance, namely, the apparent resistance in an electric current to the flow of an alternating current,—in the Krueger cable and the Smith, British cable, showing that the impedance of the latter was lower than that of the former due to the former's alleged more effective construction,—tests which we find it unnecessary to analyze or to rely upon,—nevertheless, we believe that such tests were competent evidence before the Patent Office. Whether, if the Patent Office had had before it all of the five patents upon which defendants have relied in the trial in this Court, it would or would not have concluded that any of them anticipated Krueger, it is impossible, of course, to say. But the fact that these patents were not considered by the examiner does not indicate any irregularity on his part, any more than does his consideration of the Pedersen affidavit. The examiner may not have been as thorough as is to be desired in dealing with technical matters of this kind. Indeed, we make the same criticism of the contents of the file-wrapper in this case that we have made of most file-wrappers of the Patent Office that we have been called upon to review, namely, that there is no statement as to wherein invention is found to exist. However, our complete analysis of each of the prior patents upon which defendants now rely as anticipating Krueger convinces us beyond any doubt, and entirely independently of the reasons that may have controlled the Patent Office examiner in granting the patent to Krueger, that his action was correct. Also, while the statutory presumption of validity that attaches to the issuance of a patent is only prima facie, we are satisfied that this presumption is rendered absolute by the novel features of Krueger. Knowledge after the event is always easy. It is the concept of the particular patent that counts. Here, in Krueger, we have a clear example of the well known principle of a new use,—in the present case, television,—begetting a new device, as contrasted with what defendants would have us find, namely, old devices,—that is to say, tubes of the prior art disclosed in one or more of the five prior patents relied upon by defendants,—begetting a new use.

Finally, we are satisfied that the proven commercial value of the Krueger tube affords very great support to our conclusion that it embraces hitherto undisclosed features. Krueger first produced his cable in 1948. It was on the market as early as 1949. Defendants' tube was not produced commercially until after defendants had learned about the Krueger tube, that is, not until 1952. Thereupon, defendants' sales greatly increased. It is to be noted that defendants' advertising has included a statement that defendants had applied for a patent, which has been denied by them in the present trial. In spite of the fact that the price of the Krueger tube is approximately twice that of the earlier, flat twin-lead tube, plaintiff's sales of the Krueger tube have increased until they now substantially exceed plaintiff's sales of the flat twin-lead tube. Plaintiff now has thirteen licensees of the Krueger patent, including one in Canada and three in England. Defendants themselves have described their plastoid tube by reason of its very features which we find make it an infringement of Krueger as "unique", "nothing else like it", and as giving "excellent, trouble-free reception under *all* weather conditions".

■ The act of invention "consists neither in finding out the laws of nature, nor in fruitful research as to the operation of natural laws, but in discovering how those laws may be utilized or applied for some beneficial purpose, by a process, a device, or a machine. It is the result of an inventive act, the birth of an idea and its reduction to practise; the product of original thought; a concept demonstrated to be true by practical application or embodiment in tangible form". U. S. v. Dubilier Condenser Corp., 289 U.S. 178, 188, 53 S.Ct. 554, 557, 77 L.Ed. 513. In Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 71 S.Ct. 127, 129, 95 L.Ed. 162, the Supreme Court said that while prior to that decision it "has sustained combination patents, it never has ventured to give a precise and comprehensive definition of the test to be applied in such cases." Then it proceeded to give such definition, as follows: "The negative rule accrued from many litigations was condensed about as precisely as the subject permits in Lincoln Engineering Co. v. Stewart-Warner Corp., 303 U.S. 545, 549, 58 S.Ct. 662, 664, 82 L.Ed. 1008: 'The mere aggregation of a number of old parts or elements which, in the aggregation, perform or produce no new or different function or operation than that theretofore performed or produced by them, is not patentable invention.' * * *

"Neither court below has made any finding that old elements which made up this device perform any additional or different function in the combination than they perform out of it. This counter does what a store counter always has done—it supports merchandise at a convenient height while the customer makes his purchases and the merchant his sales. The three-sided rack will draw or push goods put within it from one place to another—just what any such a rack would do on any smooth surface—and the guide rails keep it from falling or sliding off from the counter, as guide rails have ever done. Two and two have been added together, and still they make only four.

"Courts should scrutinize combination patent claims with a care proportioned to the difficulty and improbability of finding invention in an assembly of old elements. The function of a patent is to add to the sum of useful knowledge. Patents cannot be sustained when, on the contrary, their effect is to subtract from former resources freely available to skilled artisans. A patent for a combination which only unites old elements with no change in their respective functions, such as is presented here, obviously withdraws what already is known into the field of its monopoly and diminishes the resources available to skillful men. This patentee has added nothing to the total stock of knowledge, but has merely brought together segments of prior art and claims them in congregation as a monopoly". 340 U.S. 147, 150–153, 71 S.Ct. 127.

■ But in Goodyear Tire & Rubber Co. v. Ray-O-Vac Co., 321 U.S. 275, 64 S.Ct. 593, 88 L.Ed. 721, in which the Supreme Court held valid and infringed a very narrow patent in a crowded art for a leak-proof dry cell for a flashlight battery, the Court said, 321 U.S. at page 279, 64 S.Ct. at page 594: "Viewed after the event, the means Anthony adopted seem simple and such as should have been obvious to those who work in the field, but this is not enough to negative invention". Similarly, in the present case we are satisfied that defendants have failed to establish the invalidity of the Krueger patent. This burden is by law imposed upon them. 35 U.S.C.A. § 282.

For the reasons given, a decree will be signed, holding all seven claims of the Krueger patent in suit (1) valid and (2) infringed.