Milton H. Gross, New York City (Oscar W. Zenitz, Baltimore, Md., and W. R. Liberman, New York City, on brief), for appellants.

Casper W. Ooms, Chicago, Ill. (Dugald S. McDougall, Chicago, Ill., and Carroll F. Fitzsimmons, Baltimore, Md., on brief), for appellee.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

Charles R. POLLARD, Jr., d. b. a. Lytron Distributing Company; and Plastoid Corporation, Appellants,

v.

AMERICAN PHENOLIC CORPORATION, Appellee.

No. 6848.

United States Court of Appeals, Fourth Circuit.

Argued Jan. 6, 1955.

Decided Feb. 15, 1955.

DOBIE, Circuit Judge.

This is an appeal from a decision of the United States District Court for the District of Maryland, 122 F.Supp. 172, holding valid and infringed a patent for a high-frequency transmission cable owned by American Phenolic Corporation (hereinafter called Phenolic). Two questions are raised on this appeal: (1) is the patent in suit valid? and (2) if valid, is it infringed by Plastoid's product? We hold that the patent is invalid, and, since this is sufficient ground for reversal, we need not consider the question of infringement.

The patent in suit, No. 2,543,696 (hereinafter called the Krueger patent), is for a high-frequency transmission cable developed by an employee of Phenolic. According to Phenolic, the cable was designed primarily for use in the tele-

vision industry as a lead-in cable ██ necting television sets to outside antennas. No mention of television, however, is made in the Krueger patent, and it is clear that a new use for an old device is not patentable. Krueger's patent contains eleven claims. Claim 1, probably the broadest claim in suit, is typical of claims 1, 4 and 5. Claim 1 reads:

> "A cable for the transmission of relatively high frequency electric currents which comprises an elongated hollow tube constructed of a di-electric material, (claim 5 specifies polyethylene resin), the walls of the tube being relatively thin compared to the tube diameter, and a plurality of electric conductors embedded in opposite walls of the tube, said conductors being substantially coextensive with the length of said tube."

Claims 3, 8 and 9 differ from the claims of the first group by the additional requirement of "beads"—that is, thickened zones in those portions of the tube walls which carry the conductors.

Claims 2, 6 and 7 differ from the other claims primarily in that they describe the cable as being circular in cross-section and specify an air space existing between the wires.

Claims 10 and 11 differ from the other claims in suit primarily in that they specifically call for sealing of the end of the cable exposed to the weather when a connection is made.

The principles underlying this type of construction are set out in the introduction to the specifications of the patent:

> "This invention relates to improvements in multiple-lead transmission cables and refers particularly to a cable of this class wherein the field between the leads is largely air, the cable being so constructed that moisture, water, ice or other substance detrimental to the efficiency of the cable as a transmission agency can never lodge between the leads constituting the cable.

Multiple-lead cables for transmission purposes have heretofore been proposed, but substantially all have been characterized by having the leads separated by an excessive amount of solid dielectric material and the forms of said cables have frequently been such that when exposed to weather conditions moisture, water, ice, snow or other 'high loss' materials could lodge on the surface of the dielectric material separating the leads and within the electric field. In view of the fact that the field between such leads is most intense directly between the leads or conductors, the interpositioning in the field of the conductors of such 'high loss' material or materials not approaching the dielectric characteristics of air results in low transmission efficiency.

"As a feature of the present invention, the leads or conductors of the cable are embedded in diametrically opposite walls of a tube of dielectric material. The dielectric material employed is sufficiently stiff to prevent collapsing of the tube in normal use and is preferably a material which is weather-resistant and has per se good dielectric properties. By virtue of the position of the conductors in the tube walls, they will always be spaced a relatively constant distance from each other and the space between them is largely constituted of air being included between and shielded by the curved tube walls which are bisected by a plane disposed at right-angles to the plane of the conductor centerlines.

"It can readily be seen that materials which may precipitate or lodge on the walls of the tube will, by virtue of the tube walls, never be interpositioned between the conductors. Hence, the advantages of a substantially constant air dielectric always obtain."

The record indicates that Phenolic has had some commercial success with the

Krueger patent, particularly in sea-coast areas where deposits of salt on lead-in cables have caused poor television reception. Phenolic has also licensed a number of companies to produce the cable. After Krueger had obtained his patent, Plastoid began manufacturing and selling a high-frequency transmission cable under the name "Ovaltube". Phenolic, owner of the patent in suit by assignment from Krueger, brought this action against Plastoid, claiming infringement of claims one, three, four, five, nine, ten and eleven of the Krueger patent.

The Krueger patent is a product patent in a field already crowded with prior developments. Plastoid has called to our attention several prior art patents as anticipating Krueger. One of these, the Smith British Patent No. 8573 issued in 1895, is, we think, a clear anticipation of Krueger. This is a patent for an electric cable, and lines seven through twenty-five of the complete specification of the Smith patent read as follows:

"Inasmuch as the specific inductive capacity of air is considerably less than that of any known insulating material it is for many purposes of great advantage to construct an electric cable with an air space or spaces along its interior especially when currents of rapid variation are used since the speed of variation of the current is effected largely by the capacity.

"Several methods have before been used for forming cables with such interior air spaces all having more or less attendant disadvantages.

"According to this invention we construct an electric cable of gutta percha or like insulating material with a central longitudinal air space and with two or more wires embedded at distances apart in the gutta percha near to the inner surface of such tubular cable.

"One way in which we construct such a cable is to form two semicircular crescent shaped strips of gutta percha each having embedded within it near to its concave or inner side one or more conducting wires. Afterwards we bring together the two semicircular crescents so that the two together form a tube and around the exterior of this tube we form an outer tube of gutta percha or like material by an ordinary covering machine—the crescent shaped pieces being sufficiently strong to retain their form whilst this outer covering of gutta percha is being put around them."

It is obvious, we think, that Smith contains the essential knowledge utilized by Krueger. Before the Patent Office, Phenolic distinguished Smith from Krueger on the ground that Krueger had superior performance characteristics and would produce unexpected results. This position has been abandoned before this Court and it is now argued that Krueger differs structually from Smith. Phenolic points out, for example, that Smith differs from Krueger in that Smith does not call for walls of minimum possible thickness. This purely superficial difference does not rise to the dignity of invention. It is obvious to one skilled in the art that flexibility can be increased by making the walls of the tube as thin as possible as long as the tube does not collapse. See Williams v. Allied Metal Products Corp., 6 Cir., 107 F.2d 309.

Phenolic makes much of the fact that Smith constructed his cable out of three parts, i. e., the two crescent shaped strips and the wrapping, whereas Krueger's patent shows a single tube of dielectric material with the wires imbedded in the walls. This distinction is without substance. When exhibits of the prior art cables were made, the Smith cable was produced by an extrusion method using polyethylene resin as a dielectric. The resulting product was practically identical with Krueger except that the side walls of Smith were slightly thicker. Expert testimony at the trial in the lower court established without contradiction that the modern means of producing Smith's cable would be by this extrusion

method. And, as we have indicated, Krueger is a product patent, not a process patent. One witness, Hurvitz, testified:

"Anyone knows that you use polyethylene today, and I do not understand anyone has contradicted that position here and anyone knows that you make tubular cable or almost any cable, in fact, by extrusion process today. You do not make it by building up the parts and wrapping them with gutta percha tape. You use an extrusion process. Now, if you used an extrusion process, then you would extrude a tube of polyethylene with the wires embedded in the wall. That is all Smith shows."

■ It is well settled that the substitution of a modern material for other material does not amount to invention. United States Appliance Corp. v. Beauty Shop Supply Co., 9 Cir., 121 F.2d 149; Martin v. Wyeth, Inc., 4 Cir., 193 F.2d 58. See, also, Doughnut Machine Corp. v. Joe-Lowe Corp., 4 Cir., 67 F.2d 135. Merely by making Smith by modern processes, the Krueger cable is very nearly achieved. Krueger simply changed the proportions of the finished product and this alone is not invention.

Other prior patents cited by Plastoid as anticipating Krueger are Waring, No. 290,375; Marsh, No. 466,250; Holman, No. 469,248; Henley, British, No. 397,-263; Affel, No. 1,996,196. An inspection of these patents clearly reveals that they embody and teach much that is claimed to be original in Krueger.

Speaking for our Court in Interstate Rubber Products Corporation v. Radiator Specialty Co., 4 Cir., 214 F.2d 546, 548, Circuit Judge Soper said:

"Patentability * * * does not come into being merely because the device is novel and represents an interesting and useful improvement * * * and the judges may not endow with the quality of invention every new and useful advance amidst the myriad activities of a resourceful people."

In Youngs Rubber Corporation v. Allied Latex Corp., 2 Cir., 188 F.2d 945, 948, Circuit Judge Clark stated:

"It will thus be seen that the patentees took one of the oldest of electrical conceptions and adapted it rather ingeniously to a particular need of this business. Undoubtedly, this would have been held invention in times past, but now the climate of opinion has changed to require definite novelty in idea, and not merely new adaptions of an old idea."

From the opinion of Circuit Judge Martin, in O'Leary v. Liggett Drug Co., 6 Cir., 150 F.2d 656, 661, we quote:

"Perfection of workmanship, though greatly increasing convenience, extending use, or diminishing expense, is not patentable."

See, also, Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corporation, 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162; Robinson v. Digaetano, 5 Cir., 212 F.2d 1, 3; Westinghouse Electric Corporation v. Bulldog Electric Products Co., 4 Cir., 206 F.2d 574; Kay Patents Corporation v. Martin Supply Co., 4 Cir., 202 F. 2d 47; Vapor Blast Manufacturing Co. v. Pangborn, 4 Cir., 186 F.2d 230, 236.

■ We find no patentable invention in the so-called "Krueger concept." Essentially, Krueger does not materially go beyond an aggregation, with slight improvements, of:

(1) An air space directly between two wires on opposite sides of a hollow tube, as taught by Smith, Holman and Marsh;

(2) the thin walls in relation to tube diameter as taught by Marsh, Holman, Smith and Affel;

(3) the flexibility, lightness and cheapness of the prior art cable;

(4) the use of the conventional extrusion method;

(5) the use of polyethylene, a standard dielectric material used in the indus-

try long prior to Krueger, but not in existence in Smith's day.

The judgment of the District Court is reversed and the case is remanded to that court with directions to dismiss Phenolic's civil action.

Reversed.