The COLLISON SURGICAL ENGINEER-
ING COMPANY
v.
MURRAY–BAUMGARTNER SURGICAL
INSTRUMENT CO., Inc.
Civ. A. No. 13303.

United States District Court
D. Maryland.
June 22, 1964.

Leonard J. Kerpelman, Baltimore, Md., for plaintiff.

Roger A. Clapp, Hinkley & Singley, Baltimore, Md., Homer R. Montague, Washington, D. C., for defendant.

R. DORSEY WATKINS, District Judge.

This is an action brought by The Collison Surgical Engineering Company (hereinafter Collison or plaintiff) against Murray-Baumgartner Surgical Instrument Co., Inc. (defendant) for alleged infringement of United States Patent No. 2,494,229 issued on January 10, 1950 to John G. Collison on an application filed July 8, 1946 for "Bone Surgery." [1]

The parties have agreed upon the following Statement of Facts, which is adopted by the court:

"Plaintiff is the owner, by assignment, of U. S. Letters Patent No. 2,494,229 for 'Bone Surgery', issued January 10, 1950 to J. G. Collison on an application filed July 8, 1946. The patent contains 5 claims, of which claims numbered 4 and 5 are directed to a method of applying a bone fixation plate, and as to which no infringement is claimed.

"Claims 1, 2 and 3 of the Collison patent read as follows (after correction in accordance with an official Certificate of Correction):

"1. In bone surgery, a surgical bone screw, said screw made of metal suitable for bone surgery, said screw having a threaded portion and a cylindrical pilot portion adapted to fit snugly in a hole drilled in the bone cortex, and one or more recesses or pockets provided in said screw and extending from a point in the threaded portion to provide a self-tapping screw and to receive the bone chips.

"2. In bone surgery, a surgical bone screw, said screw made of metal suitable for bone surgery, said screw having a threaded portion and a cylindrical pilot portion, said cylindrical pilot portion adapted to fit snugly in a hole drilled in the bone cortex, one or more recesses or pockets provided in said screw and extending from a point in the pilot portion to a point in the threaded portion to provide a self-tapping screw and to receive the bone chips, and the threads of the self-tapping section having ground relief.

"3. In bone surgery, a surgical bone screw, said screw made of metal suitable for bone surgery, a cruciate head on said screw, said screw comprising a threaded portion and a cylindrical pilot portion, said pilot portion adapted to fit snugly in a cylindrical hole drilled in the bone cortex, and one or more recesses or pockets provided in the screw and extending from a point in the pilot portion to a point in the threaded portion to provide a self-tapping screw and to receive the bone chips."

\* \* \* \* \* \*

"The complaint was filed September 15, 1961, alleging infringement of the Collison patent by reason of Defendant's manufacture and sale of

---

1. The complaint also contained a claim against the defendant for "palming off" the alleged infringing article as that of Collison. Collison offered no legally sufficient evidence in support of this claim and virtually conceded this to be the case. At the end of plaintiff's case the court granted defendant's motion to dismiss this claim.

bone screws embodying the patented invention, said bone screws being actually purchased by Defendant from the Orthopedic Equipment Company of Bourbon, Indiana. The complaint also contained counts in 'palming off' or unfair competition, which counts were dismissed on Defendant's motion, for lack of evidence, upon completion of Plaintiff's case.

"At the trial, Defendant's vice-president, Charles Richard Lovelace, called as a witness by Plaintiff, testified to the sale by Defendant (a Baltimore dealer in surgical and hospital supplies) to South Baltimore General Hospital of a total of 3-½ dozen bone screws which Defendant procured from Orthopedic Equipment Company, all designated as their type 126-M bone screws as described on Page 4 of the supplier's catalog No. 7.

"Of these, a lot of ½ dozen screws were sold in October of 1956, and a lot of 3 dozen were sold in June of 1960. The witness also testified that the sales records which he produced showed direct shipment of both of these orders from the manufacturer (Orthopedic Equipment Company) to the hospital. Plaintiff's witness Carl Behm testified as to the receipt by the hospital of the 3-dozen lot by messenger from Defendant, produced that lot in court, and stated that the screws had never been used. Mr. Lovelace, later, on inspecting a copy of the bill rendered his firm by Orthopedic Equipment Company, and the labeling of the package, confirmed that this lot had passed through Defendant's hands.

"Plaintiff's witness Joseph W. Tracey produced a bone screw manufactured by Plaintiff, and an 8-times enlarged model thereof, and described the way in which claims 1, 2

and 3 of the Collison patent read upon the model. He also described the way in which those claims read upon the screws, Orthopedic Equipment Company type 126-M, introduced as Plaintiff's Exhibit 6 and upon the picture and descriptions of the type 126-M screws on Page 4 of the Orthopedic catalog, Plaintiff's Exhibit 4."

Defendant advanced the usual defense of invalidity by reason of anticipation, and of lack of novelty over the prior art, both that cited in the prosecution of the patent application in the Patent Office, and additional prior art offered at the trial of the case. In addition, defendant argues that mere new use of an old device cannot impart patentability to a claim drawn in product form. Defendant also claims that plaintiff is barred by laches, and that plaintiff failed to prove an actual infringement by a sale by defendant within the jurisdiction, defendant not being charged with infringement by manufacture and use.

Defendant does not seriously contend that some of the screws, allegedly sold by it, would not infringe some of the product claims in suit if the Collison patent were valid. Plaintiff contends that each of the three claims in suit is a new combination.[2] In claim 1 the combination is a combination of a pilot point adapted to fit snugly in a pre-drilled hole, and a recess which receives chips and gives a cutting edge.

In claim 2 the combination is the same, but the threads which do the cutting have ground relief.

In claim 3 the combination is the same as in claim 1, with the addition of a concave cross-slotted (cruciate) head on the screw.

Plaintiff frankly admits that a fastening screw of surgical metal used in bone surgery in conjunction with a pilot hole "compose [sic] an old environment".[3]

---

2. Plaintiff's Brief after trial, pages 1–4.

3. Plaintiff's Brief after trial, page 1. As the basis therefore plaintiff refers to

United States Patent No. 1,105,105 issued to W. O'N. Sherman on July 28, 1914, on application filed February 10, 1912, for "Surgical Appliance", referring to page

Plaintiff further commendably states[4] that "no claim is made, or could be made, that the elements making up the patented combination are new. They are not. They were well known before the Collison invention. The separate elements were all known to machining and woodworking arts before. But their synthesis, and particularly their synthesis into a device useful—highly useful, and greatly needed —in the bone surgery art *was* new."

Plaintiff naturally relies upon the statutory presumption of validity; and further argues that validity is supported by alleged commercial success, and imitation.

### Patent Office Proceedings.

As the specification states:[5]

"The invention relates to bone surgery, and particularly to *means* for applying an internal fixation plate to a fractured bone."

It then points out the necessity for the exact centering of screws to avoid pressure causing bone decay. In the invention, "the *technique* is such that every one of the screws is necessarily and positively centered with absolute accuracy with respect to its hole in the fixation plate * * *."[6]

The specification refers to a centering guide in the fixation plate; the introduction of a drill, the characteristics of which are described; the drilling of a hole and the withdrawal of the drill. It is then that the screw is described:[7]

"Each of these screws has a cruciate head and a threaded cylindrical body 13, in advance of which is a very short tapered threaded portion 14 and the end of the screw, in advance of the tapered threaded portion, is a cylindrical pilot portion 15. In the drawings this pilot portion is shown as unthreaded, but in actual practice it would have very shallow threads, because the drilled hole in the bone is of slightly greater diameter than the root diameter of the screw 13, so that when the thread 13 enters the bone the bone will not reach down to the bottom of the threads which would cause fragments of the bone to break off at the sharp edge of the bone thread. Hence, as the diameter of the drilled hole is slightly greater than the root diameter of the thread, there will remain a very shallow thread on the pilot portion which fits snugly in the drilled hole in the bone.

"This pilot portion 15 has oppositely disposed longitudinally extending recesses or pockets 16. These recesses extend from the end of the screw through the tapered portion 14 and through one or more of the threads 13 on the body. These recesses or pockets, where they pass through the tapered portion 14, produce a self-tapping screw, and to improve the self-tapping effect the threads on the tapered portion 14 have a ground relief, as indicated by numeral 17 in Figure 9, so that the screw will enter the bone more easily. The recesses or pockets 16 additionally provide relief for the bone chips by collecting them therein.

"By reference to Figure 5 it will be noted that the cylindrical pilot portion 15 of the screw has substantially the same diameter as that of the hole which has been drilled in the cortex, so that the pilot portion will make a snug fit in this hole, and hence the screw itself will be positively held in perfect alignment and perfectly centered with the drilled hole, and thus the screw will enter and follow the exact course of the

1, column 1, line 56–column 2, line 1, which refers to "vanadium steel alloy having about .25 of 1 per cent vanadium. * * *"

This patent, cited by the Patent Office, will hereinafter be referred to as the Sherman patent.

4. Plaintiff's Brief after trial, page 9. Emphasis in original.

5. Column 1, lines 1–3; emphasis supplied.

6. Column 1, lines 50–53; emphasis supplied.

7. Column 3, line 74; column 4, line 41.

hole, which is perpendicular to the fixation plate."

It may anticipatorily be noted that the specification is and was silent as to the material of which the screw was to be made; and as to any direct reference to physiological compatibility with bone tissue.

Twenty claims were filed, of which 16 were "means" or method claims, and only 4, claims numbers 12, 13, 14 and 15, were product claims. Each of these product claims was prefaced by the language "In bone surgery." At the trial, plaintiff's counsel stated that these words were merely intended to "explain the environment in which the product is used"; "the environment in which the object is used * * *" [8]

Claim 12 referred to a screw "having at its leading end a cylindrical pilot portion adapted to seat in a hole drilled * * *."

Claim 13 referred to a tapered threaded portion, followed by the cylindrical pilot portion, the threaded portion having "oppositely disposed recesses extending there-through to provide a self-tapping screw."

Claim 14 added to claim 13 "and the threads of the self-tapping portion having ground relief."

Claim 15 added to claim 14 "and said recesses extending through one or more of the threads of the threaded body to give bone chip clearance." [9]

In the first office action the Examiner rejected all claims, those with which we are concerned on:

Sherman, 1,105,105 July 28, 1914
Haynes, 2,388,482 November 6, 1945
Rosenberg, 1,526,182 February 10, 1925

This rejection was terse and apposite:

"Claims 12–15 and 20 are rejected as unpatentable over Rosenberg who shows a self tapping screw with a cylindrical pilot for guiding it in view of Haynes who shows the oppositely disposed recesses." [10]

Sherman 1,105,105 [11] while directed to, and claiming, a "surgical appliance", describes verbally and by figures the screws to be inserted in the pre-drilled holes. It is stated that:

"The threaded outer end of the screws 4 is provided with a plurality of lengthwise extending flutes 4b the flutes acting as a tap in inserting the screws in the bone and overcoming driving the screws into place." [12]

* * * * * *

" * * * After the holes have been drilled, the screws 4 are inserted in place therein, the threads thereon readily forming internal threads in the drilled holes in the bone in inserting the screws, on account of the flutes 4b on the outer ends of the screws 4 * * * *." [13]

Rosenberg 1,526,182 [14], while directed to a screw designed for use in soft metal, discloses in the specifications and drawings a non-fluted self-tapping screw having a cylindrical pilot portion designed to guide the screw along the channel of a pre-drilled hole.[15]

Haynes 2,388,482 [16], remarkably is not discussed by either plaintiff or defendant in their briefs after trial.

Haynes very clearly states the principal objects of his invention as follows: [17]

"Another object of the invention resides in the provision of a skeletal

8. Transcript, page 195.
9. File Wrapper, Defendant's Exhibit 18, pages 12–13.
10. File Wrapper, page 21.
11. See footnote 3 for full citation.
12. Page 1, column 2, lines 102–106; see also Figures 6–10.
13. Page 2, column 1, lines 9–14.
14. United States Patent No. 1,526,182 issued to H. Rosenberg on February 10,

1925, on application filed July 22, 1921, for "Screw."
15. Page 1, column 1, lines 50–54; column 2, lines 69–85; page 2, column 1, lines 18–23; Figures 1, 2, 4.
16. United States Patent No. 2,388,482, issued to H. H. Haynes on November 6, 1945, on application filed January 16, 1943, for Surgical Screw.
17. Page 1, column 1, lines 12–27.

screw having drilling and self-tapping features, whereby the screw can be firmly anchored in the bone in a single operation, thus reducing the time involved in applying the splint, which is of course a major factor.

"A further object of the invention consists in providing a skeletal screw having the foregoing features, and which is also so constructed as to provide for the discharge of the fine particles cut from the bone by the drill, thereby not only reducing to a minimum the chances of infection, but also avoiding the possibility of clogging the tapping element of the screw which would render it useless."

The screw and its operation are described as follows: [18]

"Each screw 4 comprises a shaft portion 5 on the upper end of which may be formed a tool-engaging portion 6 for use in rotating the shaft when the screw is to be applied to a bone.

"Formed on the lower end of shaft 5 is a drill portion 7, the widest dimension of which is somewhat less than the diameter of shaft 5, as shown in Figure 3. Spaced slightly above the drill 7 are four radial arms 8 separated by longitudinal grooves 9. The outer ends of the arms 8 are provided with threads 10 which are interrupted by the grooves 9; these threaded sections serving as taps to cut threads in the bone to receive the continuous threads 11 formed on the shaft 5 immediately above the thread-tapping portion.

"The grooves 9 extend downwardly below the tapping sections 8–8, and provide passages for the upward travel of the cuttings to prevent their entrance into the medullary canal and also to prevent clogging of screw; the grooves 9 are of sufficient length to receive the bone cuttings and permit the exit of some of them, thereby leaving the tap threads 10 free to cut clean and well defined threads in the bone structure.

"The lower portions of the arms 8 are preferably tapered downwardly as indicated by the numeral 12 to facilitate movement of the screw into the bone.

"The operation and advantages of the novel screw are believed to be apparent. After an incision is made in the flesh at the desired point the drill point is inserted and then rotated by an implement attached at the point 6. This rotation, with the desired pressure, causes the drill 7 to initiate an opening in the outer cortex of the bone, such opening being of slightly smaller diameter than the shaft 5. Continued rotation of the shaft causes the interrupted threads on the arms or tapping portion 8 to cut threads on the walls of the opening provided by the drill 7. The threads 11 on shaft 5 are then readily received in the opening upon continued rotation of the shaft."

Except for the pilot portion, designed to fit a pre-drilled hole [19], the essential elements of Collison—recess to receive chips and to give a cutting edge, and ground relief—are present in Haynes. In one sense, even Haynes has a pilot portion—the drill—which guides the cutting edge of the screw more perfectly than even a separate pilot would do in a pre-drilled hole. With respect to the surgical screw, Haynes drills and inserts the screw in one operation. Collison, requiring a pre-drilled hole for the use of a screw, needs a pilot independently of the drilling.

In response to the first Office Action, applicant urged that Rosenberg was not adapted to bone surgery and that even if it were, no one had suggested the use of a screw with a cylindrical pilot portion in bone surgery to prevent pressure and

18. Page 1, column 1, line 54; column 2, line 41.

19. And the absence of any disclosure of a cruciate head, which is old in the screw art, as will be shown.

resultant decay. Haynes was sought to be distinguished by the absence of a cylindrical pilot portion and as not designed to fit into a hole previously drilled in the bone.[20]

The Examiner summarily rejected the product claims "for reasons of record"[21]; and required division between the claims to the screw per se and the remainder of the claims.

In response to this second Office Action, claims 13 and 14 were amended to the form of present claims 1 and 2, primarily by the insertion after "screw" of "made of metal suitable for bone surgery", and a new claim 23, to become claim 3, was substituted for claim 15.

Applicant successfully opposed divisions.

The arguments as to non-applicability of Rosenberg and Haynes are repeated; with the addition that Rosenberg does not refer to the metal from which the screw is to be made.

The Examiner capitulated, and allowed the three product claims (and the two process claims not here involved).

Since, per custom, no reason is given by the Examiner for his decision, it is a matter of speculation as to what convinced him. As no additional grounds of distinction over Haynes and Rosenberg were given, except Rosenberg's failure to refer to type of metal, it seems likely that the insertion of the words describing the screw as "made of metal suitable for bone surgery" must have been persuasive. As to this, two comments are certainly in order. First, the Collison disclosures, as distinguished from argument of his counsel, say nothing more about the particular kind of metal to be used than do

Rosenberg and Haynes. If the mere proposed use in surgery, without disclosure in the specifications of metal, permits Collison to appropriate "a metal suitable" he was taking something just as much disclosed (or undisclosed) in Haynes, who was describing a surgical screw. Secondly, even the language used in the Collison claims is indefinite. What is "suitable" metal is not defined. No one, reading the patent, could determine in advance what metal was "suitable," what was not. If a reference to "suitable" metal is sufficient, why bother with specifications; why bother with metal; why bother with metal suitable; why not just claim a "screw suitable for bone surgery"?

Art Not Cited in Prosecution of Patent.

Of the art not cited of record, Trotter 1,909,476[22] seems to be regarded by the parties, and understandably so, as most significant. His self-tapping screw was designed "for use in brittle materials, such as 'Bakelite', slate, plaster of Paris, etc., wherein the threads must be cut and not merely forced into the materials" to overcome tendency to crack or crumble when force is applied.[23] It had a pilot, guiding the screw "which is longitudinally recessed"[24] and which receives chips.[25]

The threaded body is slightly chamfered or beveled.[26]

Plaintiff's attempt to distinguish Trotter on the basis that Trotter calls for the pilot to be "slightly less in diameter than the root of the screw threads," while Collison calls for the pilot to fit "snugly," is too finely drawn, particularly in view of Collison's statement[27] that the pilot point is to fit "neatly" and that the drilled

---

20. Applicant also argued that Haynes did not have any tapered thread portion; but see Haynes specification, page 1, column 2, lines 23–26 and Figure 4.

21. Defendant's Exhibit 18, page 34.

22. United States Patent No. 1,909,476, issued to G. C. Trotter on May 16, 1933, on application filed November 28, 1931, for "Self Tapping Screw."

23. Page 3, column 1, lines 47–55; page 2, column 1, lines 33–37.

24. Page 1, column 1, lines 18–23.

25. Page 2, column 1, lines 7–8; page 3, column 1, lines 56–63.

26. Page 1, column 2, lines 84–89; page 2, column 1, lines 39–44; page 3, column 1, lines 5–7.

27. Page 1, column 2, line 27.

hole is of slightly greater diameter than the root diameter of the screw.[28]

Olson 2,093,172 [29] relates to a self-tapping screw for use in unthreaded apertures in metal, bakelite, fibre, etc. The main body is cylindrical, while the entering portion is slightly tapered. A slot with a serrated cutting edge disposes of material cut away; as does Nicholson, 453,563.[30]

Eccentric relief (ground relief) to portions of the threads behind the leading or cutting edge, and tapered threads with flutes, are disclosed in Cook, 2,278,377.[31]

Lorenzo, 2,242,003 [32] is interesting in its disclosure of a bolt with a reduced tapered end portion, the most significant disclosure in this method and apparatus for reduction of fracture of the femur being the description of the material from which the bolt is to be made, as "non-corrosive", "ductible, free from oxidation and electrolysis, and having considerable strength. A chromium-nickel-molybdenum steel, for example, 18% chromium, 8% nickel and 2.3% molybdenum is particularly adaptable * * *." [33] This material, disclosed in the specification, is substantially the material in fact used by plaintiff, and is

infinitely more revealing than the term "suitable" used by plaintiff in his claims, but not directly called for in his specification.

Bell, 2,398,915 [34] is directed particularly to screw pins for bone surgery. The pin is preferably of stainless steel, flattened to a sharp wedge shape at one end, providing a tap for cutting its own thread. It is disclosed that the pilot drill holes should be slightly smaller than the diameter of the pins so that the threaded ends will tap their way into the bone.[35]

Cruciate heads, though for somewhat different purposes, are shown in Dow 366,158 [36] and Keeler 679,970.[37]

■ The court is therefore clearly of the opinion [38] that there is no invention in claims 1–3 of Collison, in suit, in view of the prior art, and particularly Rosenberg, Haynes and Trotter. In reaching this conclusion the court is mindful of the statutory injunction as to the prima facie validity of a patent (U.S.C. Title 35, section 282) strengthened by the fact that the Examiner considered Rosenberg and Haynes, and mentioned Sherman. (Baker-Carmack v. Davis, 4 Cir.1950, 181 F.2d 550, cert den. 1950, 340 U.S. 824, 71 S.Ct. 58, 95 L.Ed. 605). This pre-

28. Page 2, column 4, lines 6–8.

29. United States Patent No. 2,093,172, issued to C. G. Olson on September 14, 1937, on application filed March 25, 1935 for "Tapping Screw."

30. United States Patent No. 453,563, issued to E. Nicholson on June 2, 1891, on application filed June 21, 1886 for Wood Screw.

31. United States Patent No. 2,278,377, issued to John L. Cook on March 31, 1942 on application filed September 7, 1940 for Tap Stud or the Like.

32. United States Patent No. 2,242,003, issued to Frank A. Lorenzo on May 13, 1941 on application filed June 13, 1940 for Method and Apparatus for Reduction of Fracture of Femur.

33. Page 2, column 2, lines 17–27.

34. United States Patent No. 2,398,915, issued to W. L. Bell on April 23, 1946 on

application filed July 6, 1945 for "Surgical Instrument."

35. Page 1, column 1, lines 1–3, 44–52; column 2, lines 35–38.

36. United States Patent No. 366,158, issued to G. B. N. Dow on July 5, 1887 on application filed January 21, 1886 for Wood-Screw.

37. United States Patent No. 679,970, issued to H. E. Keeler on August 6, 1901 on application filed June 11, 1901 for Tension-Screw.

38. It therefore becomes unnecessary to consider whether or not Figure 9 of the patent shows an operable ground relief, as to which there is considerable doubt. While in terms this would relate only to claim 2, there can be no doubt that ground relief is important to, if not indispensable for, insertion of the screws without wobbling or without severe pressure.

sumption is considerably weakened, if not totally eliminated, by the fact that the Examiner had twice rejected product claims on these same patents; and that his subsequent allowance was apparently based upon the amendment of the claims to include a statement that the screw is made of metal suitable for bone surgery. As pointed out, nothing in the specification in Collison refers to this element, nor do the claims define "suitable"; and that insofar as this requirement could be held to be deducible from, or implicit in, "bone surgery," it would even more clearly be deducible from, or implicit in, the "surgical screw" of Sherman. The Examiner did not cite of record Trotter, or the other art introduced at the trial.

■■■ Moreover, the use of screws in bone surgery was old before Collison, as shown in Sherman, Haynes, Lorenzo and Bell, and in "brittle" substances in Trotter and Olson. In any event, the new use of an old product may not be protected by product claims. Application of Hack, 1957, 44 C.C.P.A. 954, 245 F.2d 246, 248; Old Town Ribbon & Carbon Co. v. Columbia Ribbon & Carbon Co., 2 Cir.1947, 159 F.2d 379, 382; and see Potts v. Creager, 1895, 155 U.S. 597, 15 S.Ct. 194, 39 L.Ed. 275; 35 U.S.C. § 100 (b), 101. The mere selection of a particular material for the construction of an otherwise old product or article does not rise to invention. Goldman v. Polan, 4 Cir.1938, 93 F.2d 797; Pollard v. American Phenolis Corp., 4 Cir.1955, 219 F.2d 360.

While commercial success may tilt the scales in a close case (which the court does not consider this to be), Eastern Venetian Blind Co. v. Acme Steel Co., 4 Cir.1951, 188 F.2d 247, cert. den. 1951, 342 U.S. 824, 72 S.Ct. 43, 96 L.Ed. 623; Technograph Printed Circuits, Ltd. v. Bendix Aviation Corporation, D.Md.1963, 218 F.Supp. 1, 51, affd. 1964, 327 F.2d 497, the evidence in this case shows no such "success". The evidence consists only of, one, the testimony of an orthopedic surgeon that: "I liked it very much, and where and when possible, will use the Collison screw."; and secondly, the sale by defendant of one-half dozen Collison screws to South Baltimore General Hospital in 1956; and the inspired [39] purchase, for purposes of litigation of three dozen screws by the same hospital in 1960, none of which has in fact been used in surgery.

### Infringement.

The court has already held that if the product claims were valid, some of the accused screws would infringe some of the product claims. In view of the court's holding of invalidity; the minimal sales proved; and the admitted fact that plaintiff sued the particular defendant in a jurisdiction convenient to plaintiff and where plaintiff's litigation expenses would be a minimum, for the purpose of endeavoring to secure a favorable decision and then to sue the manufacturer—it is not considered by the court that more detailed treatment is now required.

### Additional Defenses.

While the court's holding of invalidity makes it technically unnecessary to consider defendant's other defenses, a reasonable sense of humility [40] and the possible saving of future time suggest the advisability of at least their brief consideration.

### Laches.

In substance, defendant contends that the evidence shows that for some nine years before suit plaintiff had knowledge of defendant's manufacturer's alleged infringement, and gave numerous notices to this and other alleged infringers; but that plaintiff unreasonably delayed suing defendant. To this plaintiff replies that

39. No criticism is implied or made of this effort by plaintiff, and cooperation by the hospital, to prove infringement in a convenient forum.

40. If the self-recognition of humility is not inconsistent with the existence of humility.

its financial problems made difficult an earlier suit, which the court finds to be factually suported, but of dubious validity (Gillons et al. v. Shell Co., 9 Cir. 1936, 86 F.2d 600; cert. den. 1937, 302 U.S. 689, 58 S.Ct. 9, 82 L.Ed. 532; Leggett v. Standard Oil Co., 1893, 149 U.S. 287, 13 S.Ct. 902, 37 L.Ed. 737; Arrowood v. Symington-Gould Corp., S.D. N.Y.1946, 71 F.Supp. 693, 695).

Laches, even where available, is primarily a personal defense. Pierce v. International Telephone & Telegraph Co., D.Conn., 1957, 147 F.Supp. 934, 937. But defendant has failed to prove any change in position by it in reliance on plaintiff's alleged inaction, or that its ability to defend has in any way been affected, let alone adversely affected.

Infringement within the District of Maryland.

Defendant argues that while a dealer normally sells surgical devices and bone screws on the assumption that they are to be used for their intended surgical purpose, they may be used for many purposes—e. g. hanging an exposed door or to mount a marine fitting [41]. The ordering of surgical screws by a hospital would seem to meet the requirement that they were *sold for use* in bone surgery; and plaintiff's orthopedic expert testified that he used Collison screws in bone surgery when they were available. The sale under the circumstances was a sale for use in bone surgery, whether they were ever so used or not.[42]

The court holds both of these additional defenses to be without merit.

The foregoing constitutes the court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure. If the parties desire other or further findings or conclusions, they may be submitted within fifteen days from the date hereof.

41. Or perhaps given as door prizes at a manufacturer's convention?

42. Defendant's argument that it is sued for sale, not manufacture or use, but that

an actual use would have to be proved to establish the purpose of the sale, is too attenuated, if not self-contradictory.